15 So.3d 629 (2009)
Berny SERRANO, Appellant,
v.
STATE of Florida, Appellee.
No. 1D07-3338.
District Court of Appeal of Florida, First District.
June 17, 2009.
Rehearing Denied July 28, 2009.
*631 Nancy A. Daniels, Public Defender, and Alice B. Copek, Assistant Public Defender, Tallahassee, for Appellant.
Bill McCollum, Attorney General, and Giselle D. Lylen, Assistant Attorney General, Tallahassee, for Appellee.
KAHN, J.
A jury convicted appellant Berny Serrano of first-degree murder, home invasion robbery, and conspiracy to commit home invasion robbery. In this direct appeal of his convictions and sentences, Serrano challenges the denial of three motions to suppress his statements as well as certain rulings regarding testimony at trial. For the reasons that follow, we affirm Serrano's *632 convictions and sentences in all respects.

I. BACKGROUND
On January 5, 2005, nineteen-year-old Jacob Langworthy was found unconscious in his ransacked home in Levy County, a single gunshot wound to his head. Jacob died the next day. The ensuing police investigation quickly centered on appellant, then a seventeen-year-old high school sophomore. Eventually, a grand jury indicted appellant for Langworthy's murder as well as home invasion robbery and conspiracy to commit home invasion robbery.
Evidence at appellant's trial, which spanned four days between April 23 and 27, 2007, established that appellant conspired with four accomplicesfellow high school students Courtney Grant, Kenny Gross, Michael Hill, and Theophilus Lee to rob Langworthy after school on January 5, 2005, and to steal a cache of money and drugs they expected to find in his home. Each of the four accomplices testified appellant called Langworthy in advance (to make sure he was home) and showed them a handgun as the five drove to Langworthy's house. Two of appellant's schoolmates testified appellant told them he planned to rob someone after school on January 5; another student testified appellant quietly showed him the handgun during his first-period art class the day of the shooting.
Grant, Gross, Hill, and Lee all testified they were unarmed as they ransacked the house while appellant held Langworthy at gunpoint and demanded that Langworthy tell them where drugs and money were hidden. According to Hill, when he fled the house behind the other three accomplices, he left appellant standing over Langworthy with a gun and, once outside, heard a sound similar to a "thud" from inside the home. Appellant told both Gross and Grant he shot Langworthy in the head. Each of the four accomplices entered a plea, and each was serving a ten-year prison sentence at the time of appellant's trial.
Langworthy's neighbor, Elizabeth Mullins, saw "a young white man" matching appellant's description run from the home after hearing a sound similar to the report of a gunshot inside. Langworthy's grandmother, Phyliss Ann McCallum, who interrupted the robbery when she parked her car out front, saw Grant, Gross, and Lee run from the house shortly before hearing a gunshot from inside and then seeing Hill run out of the house. McCallum ran inside to find Langworthy seriously wounded on the floor and appellant, a gun in his hand, running out of the back door. Appellant's stepfather, Reinardo Pineiro, testified he owned the type of gun used to shoot Langworthya .22 caliber handgun and that the gun went missing around the time of Langworthy's murder.
The jury convicted Serrano of first-degree murder with a firearm, conspiracy to commit home invasion robbery while armed with a firearm, and home invasion robbery with a firearm. The court sentenced him to a mandatory life imprisonment on the first count, and lesser sentences on the remaining charges.
The first three issues on appeal concern the denial of appellant's motions to suppress incriminating statements made to police as well as an inculpatory letter he wrote to the trial judge. The remaining issue concerns the judge's determination that the four accomplices could testify that, to their knowledge, their clothes were free of gunshot residue or blood.
The first suppression issue concerns Serrano's confession during a one-hourtwenty-five-minute interrogation at police headquarters on January 6, 2005, the day *633 after the shooting. Sgt. Scott Tummond with the Levy County Sheriffs Office began the interrogation by describing the incriminating evidence police had gathered to that point in the investigation. When Tummond finished his summary, he explained appellant's rights pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and sought Serrano's acknowledgement of each of his rightsto remain silent, to talk to a lawyer before questioning and have a lawyer present during questioning, and to stop answering questions at any time. Appellant acknowledged each of those rights and, according to the transcript of the interview, signed a Miranda form.
Tummond then read aloud a portion of the form dealing with appellant's decision to waive his Miranda rights and sought appellant's acknowledgment of the waiver. Once appellant acknowledged the waiver, another officer, Sgt. Robert Schultz, said:
What we need to do, we need to get your side of it. We've got everybody else's side. We need to get your side to be fair and honest. That's what we need. That's why we're here. This is your opportunity, okay? That's what we need to do and this is for your benefit and for our benefit.
Appellant said in response, "I agree to tell you my side right now." Tummond then asked him, "You're willing to sit down with these two gentlemen and tell them your side?" Appellant replied, "I'll tell them my side but not answer the questions without my lawyer."
After obtaining answers to thirteen further biographical questions related to the Miranda form, Schultz told appellant, "Okay. So my understanding is, make it clear, is that you wanted to make a statement. You wanted to tell your side of the story but you're not willing to answer my questions; is that right?" Appellant did not respond audibly, but Schultz said, "Okay. Tell me whatever you want to tell me." Appellant proceeded to tell Schultz that the other four suspects asked him to participate with them in a robbery but that he declined and went home after school instead. This account comprises twenty-six lines of transcript.
Schultz then said, "Okay. So again, you don't want me to ask no questions, right? That's your officialyou don't want me asking no clarification questions. You just want to make your statement, right?" Appellant then contradicted his previous position, saying, "Well, go ahead, you can ask some questions."
At that juncture, an assistant state attorney present during the interrogation admonished appellant, "They previously told you you had the right to have an attorney here before you're asked any questions. Earlier you said you did want one before any questions were asked. But then you said you would give a statement. Now, you're saying that you will answer his clarification questions?" Appellant said, "Depending on the question," and Schultz said, "Fair enough." The prosecutor told him again, "Like they told you before, you have the right to stop at any time. Do you understand that?" Appellant said he understood, and Schultz pressed forward with substantive questions that appellant answered. At length, Serrano fully confessed to shooting Langworthy.
The second motion sought suppression of incriminating statements appellant made to an officer at the county jail on January 18, 2005, twelve days after his arrest. The record indicates that, during a meeting convened with Capt. Chuck Bastak at appellant's request, appellant offered to tell Bastak the location of the murder weapon in exchange for a promise that jail officers would arrange a contact *634 visit with his mother and a haircut. No lawyer was present during Bastak's taped conversation with Serrano, although Bastak and another officer advised appellant of his right to counsel several times before appellant said anything regarding the gun, as the transcript indicates. At length, after acknowledging several of Bastak's and another officer's admonitions of his right to counsel, appellant proceeded to tell Bastak where to find the gun, although, incidentally, the record reflects that the police did not find the gun there.
A third suppression motion concerned a letter appellant wrote to the trial judge, in which he confessed his participation in the robbery but claimed the gun discharged accidentally and that he did not intend to kill Langworthy. The letter suggested Serrano's religious beliefs impelled him to confess his involvement in the episode, even if he did not intentionally pull the trigger. In the letter, Serrano asked the trial judge to "maybe send ... home" his accomplices and to "get [him] into a courtroom whenever possible."
The trial court denied all three suppression motions after a hearing. At trial, the State played audio recordings of appellant's interrogation and his conversation with Bastak and introduced into evidence Serrano's letter to the judge. For the reasons that follow, we conclude that the court properly denied each suppression motion. We furthermore find no abuse of discretion in the trial court's decision to permit the accomplices to testify regarding the absence of visible blood or gunshot residue on their clothing.

II. ANALYSIS

A. Motions to Suppress
Appellant first argues the trial court erred in denying his motions to suppress evidence of the January 6, 2005, confession, evidence of the January 18, 2005, conversation with Bastak regarding the murder weapon, and the letter he wrote to the trial judge. Contrary to appellant's position, we find no error in admission of this evidence.[*] We will address each motion to suppress in turn.
Appellant first sought suppression of his confession to detectives the day after the shooting. A suspect undergoing custodial interrogation, faced with questions designed to elicit incriminating testimonial responses, has the right to confer with counsel beforehand and may elect to have counsel present during questioning. Miranda, 384 U.S. at 436, 86 S.Ct. 1602. A suspect may waive his or her Miranda rights but, during subsequent questioning, may think better of the waiver and decide to consult with an attorney. In Davis v. United States, the U.S. Supreme Court held that a suspect who wishes to invoke previously waived Miranda rights and to confer with an attorney "must unambiguously request counsel" in order for police officers to cease an interrogation already in progress. 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). The Court held that only a clear, unequivocal, and *635 unambiguous request for counsel will suffice: "If the suspect's statement [regarding the need for a lawyer] is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." Id. at 462, 114 S.Ct. 2350.
After Davis, the Florida Supreme Court, writing in State v. Owen, explained that
[a] suspect must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent. If the statement is ambiguous or equivocal, then the police have no duty to clarify the suspect's intent, and they may proceed with the interrogation....
Owen, 696 So.2d 715, 718 (Fla.1997) (quoting Coleman v. Singletary, 30 F.3d 1420, 1424 (11th Cir.1994)). Owen applies only where the suspect undergoes questioning after validly waiving the right to counsel pursuant to a proper Miranda warning at the outset of interrogation. Id. at 719; see Almeida v. State, 737 So.2d 520, 523 n. 7 (Fla.1999) (recognizing that Owen rule "applies only where the suspect has waived the right earlier during the session"); accord Davis, 512 U.S. at 461, 114 S.Ct. 2350 (holding that "after a knowing and voluntary waiver of the Miranda rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney").
Subsequent cases hinge on whether a suspect has made an equivocal or unequivocal assertion of the right to counsel. See, e.g., Walker v. State, 957 So.2d 560, 571 (Fla.2007) (concluding that suspect's statement, "I think I may need a lawyer," and subsequent question asking detectives whether he needed counsel, were not unequivocal requests for attorney and did not require cessation of interrogation); Jones v. State, 748 So.2d 1012, 1019-20 (Fla.1999) (concluding that suspect who confessed after telling jail guards he wanted "to talk to his mother, his attorney, and [a detective]" did not unequivocally invoke right to counsel).
Owen prohibits further interrogation after an unequivocal assertion of the right to counsel. 696 So.2d at 718-19. Nothing in the case law, however, necessarily prevents police officers from asking harmless questions to clarify a suspect's assertion of the right to counsel, even if a reviewing court determines, in hindsight, that the suspect unequivocally requested an attorney. Miranda applies, for Fifth Amendment purposes, only to questions designed to elicit incriminating testimonial responses: questions "the police should know [are] reasonably likely to evoke an incriminating response from a suspect." Rhode Island v. Innis, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); see Edwards v. Arizona, 451 U.S. 477, 485-86, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) ("The Fifth Amendment right identified in Miranda is the right to have counsel present at any custodial interrogation.").
Because a suspect's yes-or-no response to a question seeking verification of even an unequivocal clear invocation of the right to counsel could hardly be characterized as incriminating or testimonial, an officer's question to confirm the suspect's wishes, without more, does not violate clearly established law. See Owen, 696 So.2d at 718 (describing effect of unequivocal assertion of right to counsel upon propriety of further "interrogation"); Traylor v. State, 596 So.2d 957, 966 (Fla.1992) (noting that, "if the suspect indicates in any manner that he or she does not want to be interrogated, interrogation must not begin or, if it has already begun, must immediately *636 stop" (emphasis added)). This approach squares with the rule in Edwards "that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his right." 451 U.S. at 484, 101 S.Ct. 1880 (emphasis added). Because a question clarifying the suspect's wishes does not amount to interrogation, under the view of interrogation taken in Innis and subsequent cases, nothing in the case law prohibits such a question. A clarifying question must, of course, remain narrowly focused on verifying the request for counsel; officers may not "engage[ ] in conduct they could reasonably anticipate would elicit an incriminating response." Cuervo v. State, 967 So.2d 155, 164 (Fla. 2000) (holding confession inadmissible where defendant said, through Spanish interpreter during interrogation, he would "declare nothing," but where officers subsequently asked series of questions "explaining" that defendant had opportunity to talk if he wanted, among other things).
Here, appellant acknowledged his rights and waived them. The trial court found equivocation in appellant's subsequent assertion of his right to counsel because he initially said, "I agree to tell you my side right now," then said, "I'll tell [you] my side but not answer the questions without my lawyer," and finally said, "Well, go ahead, you can ask some questions." Although the trial court reached an ultimately correct conclusion in denying the motion to suppress, the language of the order does not strictly follow the case law, as the appropriate legal analysis focuses on the particular statement invoking the right to counsel and whether that statement, in and of itself, is ambiguous or equivocal. See Owen, 696 So.2d at 718 ("A suspect must articulate his desire to cut off questioning with sufficient clarity.... If the statement is ambiguous or equivocal, then the police ... may proceed with the interrogation." (quoting Coleman, 30 F.3d at 1424) (emphasis added)). We find no ambiguity in appellant's original position: he would make a statement but not answer questions without a lawyer. People make unequivocal statements all the time but subsequently change their minds; the mere fact that appellant eventually agreed to answer questions does not render his original position equivocal.
Nonetheless, we conclude that appellant's Miranda rights were not violated and that his eventual confession was admissible. After appellant made an exculpatory statement, Detective Schultz said, "So again, you don't want me to ask no questions, right? That's your officialyou don't want me asking no clarification questions. You just want to make your statement, right?" Until that point, appellant's desire not to answer questions without a lawyer had been clear and unambiguous. Had the interrogation proceeded, appellant's testimonial responses would have been inadmissible. See Owen, 696 So.2d at 718-19. Schultz's question, however, did not fall under the ambit of Miranda; he merely asked appellant to confirm he would not undergo interrogation, and appellant's response"Well, go ahead, you can ask some questions"was non-testimonial. We find nothing in the case law to prohibit such a question under these circumstances, nor does the record suggest that Schultz's follow-up question "badgered" appellant into confessing, as appellant argues.
Rather, far short of bespeaking any sinister intention on the detective's part, the record reflects that Schultz merely attempted to conclude the encounter by confirming what appellant wanted to do. The *637 outcome might be different had Schultz, instead of confirming Serrano's wishes, advised him to submit to interrogation or asked him to reconsider his position. On this record, though, we find no evidence that Schultz's question, whether or not hindsight might characterize it as superfluous, was improper. We note that an assistant state attorney in the room immediately interjected with an admonition to appellant that he had the right not to answer questions and could have a lawyer present; appellant acknowledged those rights but persisted. The context belies any suggestion appellant felt badgered or beleaguered. Had such an atmosphere prevailed, appellant would hardly have so readily agreed to proceed with an interrogation, once given the opportunity to rethink his strategy. The trial court properly determined that appellant's confession was admissible.
As to appellant's recorded conversation with Bastak, the detective whom he told where to find the murder weapon (essentially admitting his involvement in the murder), we likewise find no error. The record indicates that appellant wanted to hug his mother and have a haircut in jail and requested a meeting with Bastak to exchange information about the murder for these accommodations. Appellant has not, however, demonstrated that his statement was inadmissible as the product of coercion. The law recognizes that one may ultimately confess to a crime because of an insurmountable internal conflict that impels one inexorably toward confessing. That alone, however, absent a showing of affirmative coercion by the police, does not require suppression. See generally Colorado v. Connelly, 479 U.S. 157, 170-71, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (holding that "Miranda protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that. Respondent's perception of coercion flowing from the `voice of God,' however important or significant such a perception may be in other disciplines, is a matter to which the United States Constitution does not speak"). Furthermore, even one who has previously invoked his Miranda rights may waive them by "initiat[ing] further communication, exchanges, or conversations with the police." Edwards, 451 U.S. at 484-85, 101 S.Ct. 1880.
Appellant's conversation with Bastak is not analogous in any determinative respect to the custodial interrogation in Ramirez v. State, a case upon which appellant substantially relies. 739 So.2d 568 (Fla.1999). In Ramirez, the seventeen-year-old defendant's "Miranda warnings were not given until [the defendant] had made significant admissions of guilt. Then, immediately before administering the Miranda warnings, one of the detectives minimized their significance by suggesting in a casual, offhand manner that he did not expect Ramirez to invoke his rights" and assured him he was not under arrest. Id. at 576. The record in this case does not reflect that Bastak or the other officer present did or said anything remotely analogous to the egregious conduct of the officers in Ramirez. To the contrary, Bastak and another officer scrupulously admonished appellant several times of his right to have counsel present. The meeting was convened at appellant's unilateral request, for the express purpose of offering information about the murder in exchange for certain accommodations. The trial court properly determined appellant's inculpatory statements during this meeting were admissible. See Edwards, 451 U.S. at 485-86, 101 S.Ct. 1880 ("Had Edwards initiated the meeting on January 20, nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements *638 and using them against him at the trial."); Traylor, 596 So.2d at 966 (noting that suspect "is free to volunteer a statement to police on his or her own initiative at any time on any subject in the absence of counsel").
We likewise find no error in the trial court's refusal to keep from the jury appellant's letter to the trial judge. Appellant argues on appeal that the letter was inadmissible because it represented an attempt to negotiate a plea. See § 90.410, Fla. Stat. (2006) (providing that evidence of offers to plead guilty or statements related to such offers is inadmissible). Upon review of the letter, we find no support for this construction. On the face of the letter and in the context of the record, we cannot conclude that the letter reflects an attempt to plea-bargain or that it was written under circumstances suggesting plea negotiations had begun or would begin, as the law would require for suppression. See Stevens v. State, 419 So.2d 1058, 1062 (Fla.1982). Rather, the letter contains admissible, "[unsolicited, unilateral utterances." Id. 419 So.2d at 1062.
We have found no error in any of the rulings discussed above. Were we to find error, however, it would have been harmless. The record reflects no reasonable possibility that, considered alone or together, the January 6 confession, the conversation about the gun, or the letter contributed to the jury's verdict, in light of the substantial quantum of admissible incriminating testimony the jury heard at trial. See State v. DiGuilio, 491 So.2d 1129, 1138 (Fla.1986) (holding that, to show error was harmless, State must show "there is no reasonable possibility that the error contributed to the conviction"). Apart from the evidence at issue in the motions to suppress, Hill testified that, as the other accomplices fled Langworthy's home, he left appellant in the house, holding a gun to Langworthy's head, and heard a loud noise from inside the home as he ran away; Gross and Grant both testified that appellant admitted to them he shot Langworthy in the head as the group fled the scene; eyewitnesses testified that an armed young man matching appellant's description fled the house shortly after a gunshot crackled through the neighborhood; and appellant's stepfather testified he owned, and was missing, the type of handgun used to shoot Langworthy. The substantial evidence of guilt leads to the conclusion that appellant would have been convicted without the benefit of the evidence for which he sought suppression.

B. Evidentiary Rulings Regarding Accomplices' Testimony
At trial, the prosecutor asked each of appellant's accomplices whether, "to [his] knowledge," there was blood or gunshot residue on the clothes he wore during the robbery. In each instance, trial counsel objected and argued the question called for an expert forensics opinion that each witnessa former high school student without formal postsecondary education was unqualified to render. We find no error in the trial court's decision to permit the testimony at issue.
The evidence code precludes testimony by a lay witness relating inferences or opinions that "require a special knowledge, skill, experience, or training." § 90.701(2), Fla. Stat. (2006). "Lay witness opinion testimony is admissible if it is within the ken of an intelligent person with a degree of experience." Floyd v. State, 569 So.2d 1225, 1232 (Fla.1990). Any witness, however, may testify as to matters within the witness's personal knowledge, including personal observations. See § 90.604, Fla. Stat. (2006).
*639 Although the questions at issue, if taken further, might well have entered the province of expert opinion testimony, we cannot conclude the trial court committed an abuse of discretion in permitting the lay witnesses to testify regarding their bare observations. Indeed, one would be hard-pressed to conclude the questions called for opinion testimony at all; the questions merely sought the witnesses' observations, and the qualifier, "to your knowledge," removed the inquiries from the realm of opinion testimony. See id. Even if the questions called for opinion testimony, however, the qualifier rooted their subject matter "within the ken of an intelligent person with a degree of experience." Floyd, 569 So.2d at 1232. We find no error in the questions as narrowly phrased under the particular circumstances presented here.
AFFIRMED.
BENTON, J., concurs in result with opinion and BROWNING, J., dissents with opinion.
BENTON, J., concurring in result.
Any conceivable error in the admission of any of the statements the defendant gave was harmless beyond a reasonable doubt. As regards the assertedly expert opinion testimony, I agree with the analysis in the majority opinion.
BROWNING, J., dissenting.
In Ramirez, 739 So.2d at 568, the Florida Supreme Court held that whether a juvenile's confession is voluntary after a waiver of Miranda rights is controlled by a "totality of the circumstances" test. Because I believe the totality of the circumstances precludes admission of Appellant's statements of January 6, 2005, January 18, 2005, and June 16.2005, I must dissent.

Ramirez
In Ramirez the court addressed a juvenile's waiver of Miranda rights as follows:
The "totality of the circumstances" to be considered in determining whether a waiver of Miranda warnings is valid based on the two-pronged approach of Moran [v. Burbine, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)] may include factors that are also considered in determining whether the confession itself is voluntary. See Sliney [v. State], 699 So.2d [662] at 669 [(Fla.1997)]; see also State v. Sawyer, 561 So.2d 278, 284-85 (Fla. 2nd DCA 1990). The factors that we consider relevant here include: (1) the manner in which the Miranda rights were administered, including any cajoling or trickery; see Miranda, 384 U.S. at 476, 86 S.Ct. 1602; Brewer v. State, 386 So.2d 232, 237 (Fla.1980); (2) the suspect's age, experience, background and intelligence, see State v. S.L.W., 465 So.2d 1231, 1232 (Fla.1985) (quoting Fare [v. Michael C.], 442 U.S. [707] at 724-25, 99 S.Ct. 2560, 61 L.Ed.2d 197 [(1979)]); Doerr v. State, 383 So.2d 905, 907 (Fla.1980); (3) the fact that the suspect's parents were not contacted and the juvenile was not given an opportunity to consult with his parents before questioning, see Doerr, 383 So.2d at 907; (4) the fact that the questioning took place in the station house, see Drake [v. State], 441 So.2d [1079] at 1081 [(Fla.1983)]; and (5) the fact that the interrogators did not secure a written waiver of the Miranda rights at the outset, see Sliney, 699 So.2d at 669 n. 10; Traylor, 596 So.2d at 966.
Ramirez, 739 So.2d at 575.

January 6, 2005 Statement
First, and of overarching importance, the state blatantly failed to comply with section 985.207(2), Florida Statutes (2005).[1] *640 The record reveals no attempt by the Sheriff's Department to contact Appellant's parents when he was taken into custody, or at anytime thereafter. In Ramirez, when addressing a similar, but less egregious, failure, the court pointed out "the statute [39.037(2)] would be rendered meaningless if all that is required are perfunctory attempts to contact a juvenile's parents" and "the State ... must bear the burden of demonstrating statutory compliance." Ramirez, 739 So.2d at 578. Alarmingly, the Sheriff's Department did not attempt any contact with Appellant's parents, in contrast to a telephone message left on the defendant's parents' answering machine in Ramirez. In fact, during Appellant's long incarceration before trial (six months), the record is silent as to whether Appellant's parents were ever contacted by the authorities. Under Ramirez it is the State's burden to prove record compliance with section 985.207(2), and it utterly failed to do so, or even attempt to do so, for that matter. In my view, this factor alone compels reversal, but even assuming arguendo that it does not, I find other circumstances that augment that failure and, under the "totality of the circumstances" test certainly compel reversal of Appellant's conviction.
That next deficiency occurred when Appellant unequivocally asserted his right to counsel by stating he would "not answer questions without my lawyer." At that point in time, the deputies should have ceased questioning Appellant until a lawyer was appointed. Spradley v. State, 442 So.2d 1039, 1042 (Fla. 2nd DCA 1983). Nor can the State plausibly maintain, as determined by the majority opinion, that Appellant's election of counsel was not unequivocal, because Sgt. Tummond made the following record statement to Appellant:
I'm not asking nothing [sic] about your case or what the chargesyou already said you don't want nobody to say nothing.....
* * *
You have the right to have an attorney here before you're asked any questions. Earlier you said you did want one before any questions were asked.

(underlining added). This exchange vividly reveals what Sgt. Tummond knew before Appellant made his statement adverse to his interest. Accordingly, Sgt. Tummond and the other deputies present should have stopped and provided Appellant with counsel right then and there. For this failure, Appellant's statements should be inadmissible.

Statement of January 18, 2005
Appellant's statement of January 18, 2005, is inadmissible, just like his January 6, 2005, statement, and the trial judge should have excluded it. This statement was given after Appellant asked for a meeting and offered to tell the State the location of the murder weapon in exchange for a visit with his mother and a haircut. Before consummating this exchange, Capt. Bastak asked Appellant if he had an attorney. When Appellant told him the attorney who had contacted him (presumably a public defender) would not be representing him, Bastak told him "you technically have an attorney" and proceeded to take Appellant's statement. How a defendant "technically has an attorney" is a mystery to me. It is apparent from the record that the public defender's office had a conflict and never intended to represent Appellant. The public defender's office was at that very time representing co-defendants, who as early as January 5, 2005, had "fingered Appellant" as the shooter and were busy seeking to mitigate their sentences' severity by giving adverse testimony against Appellant. However, despite this obvious conflict, a "conflict attorney" was not appointed *641 for Appellant until May 19, 2005, a useless gesture by that time because Appellant's statements already had been given.

Statement of June 6, 2005
Finally, I would suppress Appellant's June 6, 2005, letter to the trial judge. The letter represented a pro se filing when Appellant was represented, finally, by conflict-free counsel. The letter should have been rejected and returned, as a pro se filing is not acceptable when a defendant is represented by counsel. See Logan v. State, 846 So.2d 472, 479 (Fla.2003); Mourra v. State, 884 So.2d 316, 320-21 (Fla. 2nd DCA 2004).

General Consideration
A new trial, in this circumstance because of Appellant's alleged heinous acts, is sure to raise a "hue and cry" that a known criminal is being released on a technicality. However, a recent Duval County case that drew the attention of this Court, and the public, reveals the reasons for a strict application of Ramirez to a juvenile's confession after a waiver of Miranda rights, and the mischief that can flow from a failure to do so. See Curtis v. State, 876 So.2d 13 (Fla. 1st DCA 2004). Before Curtis was charged, a fifteen-year-old juvenile, Brenton Butler, was charged with killing the same woman during an armed robbery. Butler was identified as the killer by the deceased woman's husband, an eyewitness. Butler was induced to waive his Miranda rights after the police violated section 39.037(2), Florida Statutes, by failing to call Butler's parents, as here; and Butler later confessed to the murder. At trial, Butler's confession was deemed voluntary over objection, admitted as evidence, and presented to a jury that had the good judgment to acquit him. In all probability, a guilty verdict would have resulted in the destruction of Butler's meaningful life. However, to the credit of the jury, and not of the judiciary, a great injustice was avoided, as revealed by subsequent events. After Butler's acquittal, the real perpetrator of the murder was identified, tried, and found guilty of the murder on irrefutable hard forensic evidence. See Curtis.
This occurrence is a prime example of why Ramirez should be strictly applied without hesitation here. One cannot know whether Appellant is innocent, as was Butler; however, I can assert that due process, the right to counsel, calling a juvenile's parents as required, and giving Miranda warnings should be strictly required for the reasons exhibited by the misdeeds surrounding the Butler prosecution, and these requirements were violated here. Our system is designed to free the innocent and not secure convictions by recognized unreliable procedures, as were applied here.
In my view, although I think Ramirez requires reversal, a minor's confession should be considered involuntary and inadmissible as a matter of law unless a parent, guardian, or counsel is present and consents to a waiver of his or her Miranda rights. Florida law, on the one hand, will not allow a juvenile to contract for goods and services, but will allow the same juvenile to "contract" away his Miranda rights, a far more serious consequence in most circumstances. See Chap. 743, Fla. Stat.; Gautier v. Bradway, 87 Fla. 193, 99 So. 879 (1924). Surely, if Miranda rights mean anything, a juvenile should not be allowed to waive them absent the consent of a parent, attorney, or legal guardian. A minor's natural immaturity is recognized when contracting for goods and services, and it is common knowledge that a judgmental imbalance exists when a minor is dealing with an adult, and especially with a police officer. Surely, due process rights are just as important as the right to contract. That imbalance should be recognized *642 and respected when Miranda rights are waived, just as in the case of a contract. In my view, one day this will be the law, because allowing a juvenile to confess to a crime after individually waiving his or her Miranda warnings is inconsistent with what we all know to be the status of human behavior and the fair administration of justice and due process.
For these reasons, I would grant Appellant a new trial and mandate exclusion from evidence Appellant's statements of January 6, 2005; January 18, 2005; and his letter of June 6, 2005. Thus, I dissent from this Court's failure to do so.
NOTES
[*] With all respect to the dissenting opinion, the arguments raised in that opinion concerning notification of the parents, and the letter appellant wrote to the trial judge being a "pro se filing," were made neither to the trial court in the motions to suppress, nor are they raised on appeal before this court. Moreover, and with regard to the two statements made by Serrano to law enforcement, the record before us does not establish the proposition that Serrano's parents were not contacted (even assuming the argument had been made below). With regard to the statements made by Serrano to law enforcement, as well as to the letter authored by Serrano and sent to the trial court, this opinion addresses the issues raised in Serrano's brief.
[1] Formerly section 39.037(2), Florida Statutes. See 1997 Fla. Laws, c. 97-238, § 15.