CIKLIN, J.
Kimon Black appeals his convictions for two first-degree murder charges and the resulting two life sentences. We review whether the trial court erred in denying Black’s motion to suppress the statements he made to police after his Miranda[1] rights were administered. Because Black clearly and unequivocally invoked his right to counsel, we hold that the police were required to immediately stop questioning him, and any statements that resulted from continued questioning- should have been suppressed. Because the error was not harmless, we must reverse and remand for a new trial.
On August 8, 2003, Stanley Johnson and Otis Hayes were shot to death outside a party in Broward County during a fray involving multiple individuals. Almost three years later, on June 2, 2006, Kimon Black was arrested for the murders and taken into custody by detectives of the Broward County Sheriffs Office. After leaving Black in an interrogation room by himself and with a video camera recording all activities within the room, Detectives *343 Timothy Duggan and Frank Ilarraza entered. Following some preliminary questioning of Black relating to his name and ability to read, the detectives had Black read a Miranda form out loud, including Black’s answers to each Miranda inquiry. As to Black’s Miranda rights, the following exchange between Black and Detective Duggan took place:
THE DEFENDANT: You have the right to remain silent. That is, you need not talk to me nor answer any questions that you do not want to. Do you understand that?
THE DETECTIVE: Do you understand?
THE DEFENDANT: Yes.
THE DETECTIVE: Okay. What about number three?
THE DEFENDANT:[2] Should you talk to me, anything you say can and may be used against you in a court of law. Do you understand? Yes.'
You have the right to talk to an attorney or a lawyer before you talk to — and have an attorney/lawyer here with you during any questioning — during questioning now or in the future, do you understand? Yes.
If you cannot afford to retain your own attorney/lawyer and you want an attorney/lawyer, one will be appointed for you before we ask any questions. Do you understand that? Yeah, I understand that.
If you decide to answer the question now without any attorney present, you will have — you will still have the right to stop answering at any time until you talk to an attorney. Do you understand? [No audible answer]
Knowing and understanding your rights as I have explained them to you, are you willing to answer my questions without an attorney? No.
Have you previously requested any lawyer enforcement — have you previously requested any law enforcement officer to allow you to speak to any lawyer? Not yet.
THE DETECTIVE: Okay, put no. Sign your name.
THE DEFENDANT: I, Kimon Black, have read or have had it read to me and I understand my rights. Were these rights (inaudible) — a statement and answer questions regarding an attorney present.
I understand that I can stop answering any questions at any time. No threats or promises have been made to me. I understand and know that I’m (inaudible) — and this statement will be used in a court of law. Put in the time here?
THE DETECTIVE: Sure, it’s 9:42. Sign your name here and print your name here. I will witness it. Thank you. Kimon, do you want to talk to either Frank or I about the double murder? [3]
At this point, Black began a lengthy narrative- response which directly addressed the events surrounding the double homicide. Recognizing that Black had, minutes earlier, unequivocally invoked his right to counsel, Detective Ilarraza asked Black whether he was “still willing to talk to us now about this?” This time, Black replied, ‘Yeah, I’ll talk to you briefly about it; briefly.” The detective inquired one last time, “Without an. attorney?” and *344 Black responded, “Yeah.” After this exchange, the detectives questioned Black extensively about the double slaying. While Black did not' specifically confess or make any directly inculpatory statements, he detrimentally contradicted himself numerous times and made statements that became the centerpiece of the state’s case against him.
Defense counsel filed a motion to suppress any statements that Black made after he invoked his right to counsel. The trial court held a suppression hearing at which the detectives testified and a DVD recording of the entire interrogation was played. The trial court issued a written order denying the motion to suppress, stating that one of the detectives had testified that he did not comprehend Black’s response of “no” (to the question of answering questions in the absence of an attorney) and that the same detective had been up for an extended period of time and “missed” Black’s responses to the Miranda questions. A thorough review of the suppression hearing transcript reveals no evidence to support these findings by the trial court. Neither detective testified about being tired and neither detective used the word “missed” when describing their comprehension of Black’s answers. As a matter of fact, Detective Duggan testified repeatedly on cross-examination that he clearly understood Black’s responses to each Miranda question the first time. Finally, the trial court found that Davis v. United States, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994)—in which the United States Supreme Court held that after a defendant waives his Miranda rights, he can only reassert them with clear and unequivocal language — controlled this case. The trial court concluded that, notwithstanding Black’s clear in-voeation of his right to counsel, he waived his Miranda rights when he continued to speak with the detectives anyway.
Ordinarily, “when reviewing a ruling on a motion to suppress, an appellate court presumes the trial court’s findings of fact are correct and reverses only those findings not supported by competent substantial evidence.” Pierre v. State, 22 So.3d 759, 765 (Fla. 4th DCA 2009) (citation omitted). Additionally, the trial court’s findings of law are reviewed de novo. Id. However, “this deference to the trial court’s findings of fact does not fully apply when the findings are based on evidence other than live testimony.” Id. (quoting Parker v. State, 873 So.2d 270, 279 (Fla.2004)). In this case, the main issue before us relates back to the administration of Miranda warnings to Black and the exchange that occurred afterward — all of which was captured by a video camera and preserved on DVD. This DVD was played in its entirety at the suppression hearing and it appears to be largely on what the trial court based its findings. The trial court also based its order (denying the motion to suppress) on testimony offered by both detectives at the suppression hearing. As such, we review the trial court’s findings that are based on hearing each detective’s live testimony under the ordinary “competent and substantial evidence” standard. However, to the extent that the trial court’s findings are based on viewing the interrogation DVD, which this court of course, has also viewed, we utilize a much less deferential standard.
To protect suspects’ constitutional right against self-incrimination,[4] law enforcement officers are required to inform them of their right to remain silent and to have counsel present at any custodial in *345 terrogation. Miranda v. Arizona, 384 U.S. 436, 444-45, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Once an individual has invoked his or her right to counsel, police questioning of the person must cease immediately. Id at 474, 86 S.Ct. 1602 (“If the individual states that- he wants an attorney, the interrogation must cease until an attorney is present.”); Edwards v. Arizona, 451 U.S. 477, 485, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (“We ... emphasize that it is inconsistent with Miranda and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel.”); Davis, 512 U.S. at 458, 114 S.Ct. 2350 (reiterating the Miranda and Edwards holdings that the police must cease interrogation of a person once he or she has clearly invoked the right to counsel). The United States Supreme' Court has explained why police must immediately halt any questioning of the suspect upon the suspect’s invocation of the right to counsel:
[A]ny statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle ór otherwise. Without the right to cut off- questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.
Miranda, 384 U.S. at 474, 86 S.Ct. 1602.
Any statements that are produced as a result of a Miranda violation must be suppressed. Id. at 479, 86 S.Ct. 1602 (“[U]nless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.”).
“The safeguards provided by Miranda apply only if an individual is in custody and subject to interrogation.” Timmons v. State, 961 So.2d 378, 379 (Fla. 4th DCA 2007). Black was clearly in custody as he had been arrested and placed in an interrogation room by law enforcement officials. The detectives intended to interrogate Black about his involvement in the double homicide, so Miranda warnings were obviously required. This factor is undisputed. The interrogating detectives were also aware of this necessity as they dutifully 'administered Black’s Miranda warnings' prior to interrogating him. Accordingly, the issue here is not whether Miranda warnings were necessary, but whether the police honored Black’s answer that he did not want to speak to them without his attorney present. We find that they did not.
In the instant case, Black clearly asserted his right to counsel when he answered “no” to the inquiry, “Knowing and understanding your rights as I have explained them to you, are you willing to answer my questions without an attorney?” The detective who administered Black’s Miranda warnings testified repeatedly that Black’s answers to each Miranda inquiry were clear and he understood them. Having determined that Black clearly invoked his right to counsel, we must now determine whether the police continued interrogating Black in spite of that invocation.
“[T]he term ‘interrogation’ under Miranda refers not only to express- questioning, but also-to any words or actions on the part of the police. (other- than those normally attendant to arrest and custody) that the police should knpw are reasonably likely to elicit an incriminating response from the suspect.” Rhode Island v. Innis, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). (footnotes omitted).
Quite simply, asking Black — after he clearly invoked his right to counsel— *346 “Kimon, do you want to talk to either Frank or I [sic] about the double murder?” is likely to elicit an incriminating response. In fact, a follow-up question asking a suspect — after he or she just clearly invoked his or her right to counsel — whether the person wants to speak to the police anyway, appears to be the type of question designed to wear down a suspect’s resist tance to police questioning. Given Black’s clear invocation of his right to counsel, the detective’s follow-up question can only-be viewed as an effort (intended or not) to wear down Black’s resistance and make him change his mind.[5] As such, all of the statements that resulted from the failure to respect Black’s right to counsel are — by definition — in violation of Miranda.[6]
After Black clearly invoked his right to counsel, his responses to additional police questioning would be admissible only if this court were to find that Black “(a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked.” Smith v. Illinois, 469 U.S. 91, 95, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984) (citation omitted). The law is abundantly clear that “when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.” Edwards, 451 U.S. at 484, 101 S.Ct. 1880. Black did not re-initiate any conversation with the detectives; rather, it was the detectives who continued to question Black after he invoked his right to counsel. Therefore, the later attempt by one of the detectives to establish Black’s waiver of his right to counsel was ineffective. It is for this reason as well that the trial court erred in relying upon Davis. Davis applies where a defendant, who has already validly waived his or her Miranda rights, attempts to re-assert them later. See Davis, 512 U.S. at 461, 114 S.Ct. 2350 (“[A]fter a knowing and voluntary waiver of the Miranda rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney.”). In the instant case, any waiver of Black’s Miranda rights was invalid because it was based upon police-initiated interrogation. See Edwards, 451 U.S. at 484-85, 101 S.Ct. 1880 (“[A]n accused, ... having expressed *347 his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police
The state repeatedly emphasized Black’s interrogation statements in its opening statement and played to the jury the entire interrogation DVD. Black did not testify at trial and the main focus of the state’s closing argument was the interrogation DVD. The state’s constant closing argument drumbeat was that of a challenge to the jury to test the credibility of the state’s case by reviewing the DVD. The state used Black’s interrogation answers to urge a guilty conscience and implored the jury to play the DVD again during deliberations. Thus, the error here was not harmless. See State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986) (stating that, to prove that an error was harmless, the state must show “there is no reasonable possibility that the error contributed to the conviction”).
In many matters — if not most — involving custodial interrogation vis-á-vis Miranda, cases fall on particular distinctions, differences, and factual nuances that are intricately imbedded .within complex and sometimes obscure factual scenarios. Seldom are appellate courts presented with a set of facts that illuminate a bright line thereby permitting a clear and simple application of the exclusionary rule. To that extent, we are fortunate.
The issue before us could not be more straightforward and uncomplicated. The digital recording of the interrogation that occurred in this matter leads to only one inescapable conclusion. When the suspect audibly read and unhesitatingly answered “no” to the following question, his interrogation should have immediately halted: “Do you wish to answer any questions without a lawyer present?” To hold otherwise would strike at the very heart and meaning of the Fifth Amendment.[7] While we do not ascribe any ill motives to the detectives involved in Black’s interrogation, the bright line in this case was clearly crossed.

Reversed and remanded for a new trial.

POLEN and LEVINE, JJ., concur.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. At this point, Black proceeded to read each Miranda inquiry out-loud as well as state his answer to each without being prompted by Detective Duggan.

. The entire interrogation was video recorded onto a DVD, which was played, in its entirety, at the suppression hearing and trial.

. This right is enshrined in both the United States Constitution and the Florida Constitution. U.S. Const, amend. V; art. 1, § 9, Fla. Const.

. Had Black's response to the Miranda inquiries been unclear or ambiguous, the detectives would not only have been allowed to but also obligated to ask clarifying questions to determine Black's intent. See Alvarez v. State, 15 So.3d 738, 745 (Fla. 4th DCA 2009) ("Thus, an ambiguous waiver ;must be clarified before initial questioning.”). However, Black's answer was not ambiguous in any sense, so clarifying follów-up quéstions were unnecessary.

. We acknowledge that the First District held differendy in a recent case. See Serrano v. State, 15 So.3d 629, 635 (Fla. 1st DCA 2009) ("Because a suspect's yes-or-no response to a question seeking verification of even an unequivocal clear invocation of the right to counsel could hardly be characterized as incriminating or testimonial, an officer's question to confirm the suspect's wishes, without more, does not violate clearly established law.”). While we disagree with that holding to the extent that it is inconsistent with the reasoning in this opinion, we note that in Serrano one judge dissented and another concurred with the outcome only and decided to affirm under a harmless error analysis. Therefore, the First District advanced three very different legal reasons to resolve the case, none of which had majority support. Because of the fractured nature of the Serrano opinion, the Florida Supreme Court found that it was unable to review the holding on appeal. See Serrano v. State, 26 So.3d 582 (Fla.2010) ("[T]he Court has determined that it lacks jurisdiction in this case because there is no majority decision on the merits.”). As such, we do not certify Serrano as being in conflict with our holding here.

. “The right to counsel established by Miranda is a procedural safeguard that is not a right itself protected by the Constitution but is instead a measure to protect the Fifth Amendment right against compulsory self-incrimination.” Spivey v. State, 45 So.3d 51, 54 (Fla. 1st DCA 2010) (citing Davis, 512 U.S. at 457, 114 S.Ct. 2350).