DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**ANTONNINE SCOTSMAN,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D15-2729

[February 21, 2018]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Raag Singhal, Judge; L.T. Case No. 12007884CF10A.

Carey Haughwout, Public Defender, and Paul Edward Petillo, Assistant Public Defender, West Palm Beach, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Jessenia J. Concepcion, Assistant Attorney General, West Palm Beach, for appellee.

KLINGENSMITH, J.

Appellant, Antonnine Scotsman, appeals his convictions and sentences for three counts of armed robbery and one count of aggravated assault. He claims detectives violated his *Miranda* rights by continuing to engage with him after he invoked his right to counsel, which led to a confession that was used against him at trial. We agree and reverse.

Almost two weeks after appellant was taken into custody for an unrelated offense, the investigating detective visited appellant at the housing facility to ask if he had any information about an armed robbery. Appellant was not a suspect at the time. One week later, appellant and other individuals were transferred to the Broward County Sheriff's Office for questioning as possible suspects in the crime. When they arrived, they were placed in separate interrogation rooms.

Videotapes and voice recordings from the interrogation rooms allow us to understand what occurred there. The lead detective, along with a second detective, entered the interrogation room, and initiated a conversation explaining the need to go over the *Miranda* waiver form again

before continuing to speak with appellant. The lead detective started by asking appellant for his name. When the detective was unable to understand his response, appellant asked, "[T]hey sending me a lawyer?" The detective then explained, if "you want to at any time like I told you before, you can say let's stop right now." The detective further clarified, "You don't want to do it this time? This is very important, man." The detective said he could not force appellant to talk, but showed appellant pictures of the other suspects and said, "They're talking. First one talks, deals."

Before leaving the interrogation room, the second detective asked appellant if he knew how much time he was facing, and both detectives commented on appellant's young age. When appellant asked what he was facing, the lead detective told him, "Good luck to you man. These guys already talk. All right. So don't say I didn't give you a chance." Appellant asked for a second time what he was facing, at which time the lead detective pointed to a picture of one of the other suspects and said:

> I'm going to tell you [what I] was telling you about, it was him [calling you], you know how I know? He already told me. Okay? All right?
>
> No more breaks after this. The gloves come off. After we leave here, today it's a done deal. I'm not going to be friendly anymore. Because he told me--

After appellant attempted to respond, the lead detective said, "Man, you got some explaining to do," and told appellant he was going to be "charged with armed robbery with a firearm . . . . You might not be coming home anytime soon." Appellant was then given a cellphone and left alone in the room to call his grandmother. He talked with her for approximately fourteen minutes before the lead detective abruptly re-entered the interrogation room and took the phone, leaving the room once again. Appellant was left alone in the interrogation room for about forty minutes until another officer came in. At that point, appellant asked to use the bathroom, and complained about the temperature in the interrogation room. After the officer departed, appellant was left alone in the room once more.

An hour later, appellant repeatedly knocked on the door, and appeared visibly in need of the bathroom. Appellant attempted to get the attention of an officer for two minutes before urinating in the corner of the interrogation room. An officer responded to appellant's knocking a short

time later, and told him that they would clean it up. After this, appellant was, again, left alone in the interrogation room.

Two hours later an officer checked on appellant and told him they were "almost done." Appellant was left alone in the room once again. Another hour passed before an officer opened the door to the interrogation room and asked appellant if he needed to use the bathroom before departing. Thirty minutes later, the lead detective re-entered the room and told appellant they would feed him before taking him back to jail. As he escorted appellant from the interrogation room, the detective said, "I know you asked for your attorney; I'm not going to talk to you, but I'm going to let you know that you are being charged with armed robbery."

Appellant was then escorted to another room where he sat with one of the other suspects for approximately thirty minutes. After appellant was given food, he asked who was being charged with armed robbery. The detective asked appellant several times, "You want to talk to me?" before appellant finally responded by nodding his head.

After leaving the interrogation room to use the phone, the lead detective returned and led the other suspect out. When they were alone, the lead detective then stated, "All right, real quick, when I was speaking to you a moment ago you said you want to talk to me." He once again informed appellant that before they could talk he would have to go over the *Miranda* form again. After the detective explained the *Miranda* form to appellant, the following exchange took place:

> DETECTIVE: All right. Number eight. This is very important. When we first approached you hours ago talking, you said no. You weren't going to talk to me. On your own free accord, now you are saying you are going to talk to me, right?
>
> APPELLANT: Yes.
>
> DETECTIVE: Okay, (inaudible). Have you previously requested any law enforcement officer allow you to speak with your attorney?
>
> APPELLANT: Yeah.
>
> DETECTIVE: You have. But you still want to make a statement with me, right?
>
> APPELLANT: Okay.

3

Appellant was then taken out of the interrogation room to speak with the second detective, to whom he admitted that he drove his car along with the other suspects, and helped them commit the robbery. In all, appellant was at the station for more than eight hours when he finally confessed his involvement in the crime to the second detective.

The State charged appellant with three counts of armed robbery with a firearm and mask while in actual possession of a firearm and one count of aggravated assault with a firearm while in actual possession of a firearm. Prior to trial, defense counsel argued appellant's confession should be suppressed because appellant invoked his *Miranda* rights and law enforcement engaged in a series of improper tactics to get appellant to confess. The trial court denied the motion to suppress, and an audio recording of appellant's confession was entered into evidence and played for the jury. The jury returned a verdict of guilty on all counts. This appeal followed.

"A trial court's ruling on a motion to suppress comes to the appellate court clothed with a presumption of correctness and the court must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court's ruling." *Jackson v. State*, 18 So. 3d 1016, 1027-28 (Fla. 2009). Generally, appellate courts should give deference to the trial court's findings of fact if the findings are supported by competent and substantial evidence. *See Pierre v. State*, 22 So. 3d 759, 765 (Fla. 4th DCA 2009). However, when the findings are based on evidence other than live testimony and the evidence is available to the appellate court in the same form that was available to the trial court, the appellate court will review the trial court's application of the law to the facts de novo, independently reviewing mixed questions of law and fact that ultimately determine constitutional issues. *See id.* (relying on the Florida Supreme Court's exception to the complete deference standard when findings are based on evidence other than live testimony in *Parker v. State*, 873 So. 2d 270, 279 (Fla. 2004)).

The Fifth Amendment to the United States Constitution and Article I, section 9 of the Florida Constitution provide that persons shall not be compelled to be witnesses against themselves in any criminal matter. "[A]n individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation . . . . [T]his warning is an absolute prerequisite to interrogation." *Miranda v. Arizona*, 384 U.S. 436, 471 (1966). If the suspect requests a lawyer, then interrogation must not commence, and if any such interrogation has already begun, then it must immediately stop

until a lawyer is present. *See Traylor v. State*, 596 So. 2d 957, 966 (Fla. 1992).

Whether an interrogation must stop often depends on whether the suspect has made an "unequivocal" request for counsel. *See Moss v. State*, 60 So. 3d 540, 543 (Fla. 4th DCA 2011) (holding that "I want a lawyer" and "I want to talk to a lawyer" were unequivocal requests); *Black v. State*, 59 So. 3d 340, 345 (Fla. 4th DCA 2011) (holding that the defendant's response of "no" when asked "are you willing to answer my questions without an attorney?" was an unequivocal request).

Here, the State concedes that appellant initially made an unequivocal request for counsel at the start of his interrogation, but contends that he later changed his mind, and agreed to voluntarily speak with the detectives. However, the law is clear that once a suspect makes an unequivocal request for counsel, the police must scrupulously honor that request, and immediately cease the interrogation. *See Cuervo v. State*, 967 So. 2d 155, 164 (Fla. 2007).

In *Cuervo*, after the defendant invoked his right to remain silent, the police told him that he still had the opportunity to tell "his side of the story." *Id.* The Florida Supreme Court held, "These remarks undermined the warning to [the defendant] that *anything* he said could be used *against him* in a court of law." *Id.* at 165. Furthermore, the officer's failure to scrupulously honor the defendant's decision to remain silent and persistent questioning nudged the defendant into waiving his *Miranda* rights. *Id.* Ultimately, the court concluded the trial court's failure to suppress the defendant's confession was not harmless and there was a reasonable possibility that the error affected the verdict. *Id.* at 167.

Given appellant's clear invocation of his right to counsel, the detective's follow-up comments and statements effectively wore down appellant's resistance and made him change his mind. *See Black*, 59 So. 3d at 346. In *Black*, after the defendant invoked his right to counsel, the detective continued to ask him whether he wanted to talk to them about the crimes. *Id.* This court concluded that any of the "statements that resulted from the failure to respect [the defendant]'s right to counsel are—by definition— in violation of *Miranda*." *Id.*

Once a suspect invokes his or her right to speak to counsel, any responses resulting from further police questioning can be admissible "if the accused initiates further conversation, is reminded of his rights, and knowingly and voluntarily waives those rights . . . ." *Welch v. State*, 992 So. 2d 206, 214 (Fla. 2008). However, this applies only if the police

5

scrupulously honor the suspect's request for counsel and immediately cease the interrogation prior to the suspect voluntarily re-engaging with them. *See State v. Brown*, 592 So. 2d 308, 309 (Fla. 3d DCA 1991).

In *Brown*, the court held that the defendant's confession was not freely and voluntarily given, even though the defendant reinitiated conversation. *Id.* at 308-309. When the defendant unequivocally invoked his right to counsel, the officer continued to discuss the evidence they had against the defendant in his presence. *Id.* The officer ended the interrogation, and left the defendant alone for approximately an hour and a half. *Id.* When the defendant was later removed from the interrogation room for booking, he told the officer he wanted to tell "his side of the story." *Id.* at 308. The trial court concluded that, regardless of the lapse of time between the officer's statements and the defendant's waiver, this did not render the defendant's confession as freely and voluntarily made. *Id.* The officer's statements to defendant after he invoked his rights were both "protracted and evocative," and were likely to prompt incriminating responses. *Id.* at 308-09.

Similarly, though several hours passed between appellant's request for a lawyer and his apparent change of mind, the reinitiated communication with the detective was a delayed product of the coercive tactics employed following the detective's failure to scrupulously honor appellant's request for counsel. The record does not reflect that appellant ever asked to speak with the detective of his own volition. The detective continued to engage with appellant after he invoked his *Miranda* rights at the start of the interrogation when he told appellant about the evidence against him and continued to question him. Later, the detective asked appellant several times if he wanted to talk, abruptly left the interrogation room to answer a call, and subsequently engaged in dialogue with appellant when he returned.

From this record, there is no indication that appellant actively or voluntarily sought to re-engage in a conversation with the detective. Admitting the statements obtained from appellant under these circumstances constituted harmful error and requires a new trial. *See Calder v. State*, 133 So. 3d 1025, 1032 (Fla. 4th DCA 2014). Because we remand this case for a new trial, it is unnecessary to address the other issues raised on appeal.

*Reversed and remanded.*

GROSS and MAY, JJ., concur.

6

\*          \*          \*

*Not final until disposition of timely filed motion for rehearing.*