912 So.2d 69 (2005)
Joseph ORIGI, Appellant,
v.
STATE of Florida, Appellee.
No. 4D04-1223.
District Court of Appeal of Florida, Fourth District.
September 28, 2005.
Carey Haughwout, Public Defender, and Alan T. Lipson, Assistant Public Defender, West Palm Beach, for appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Melynda L. Melear, Assistant Attorney General, West Palm Beach, for appellee.
GROSS, J.
This case concerns a ruling on suppression of two items: (1) illicit drugs discovered in the passenger compartment of a car after a DUI arrest and (2) a statement elicited by a Florida Highway Patrol trooper after the suspect invoked his right to silence. We affirm the order denying the motion to suppress the seizure of the drugs, but reverse the order denying the motion to suppress the statement.

*70 The Traffic Stop

On a September night in 2002, FHP Trooper Anthony Lee pace-clocked appellant Joseph Origi's car moving at about 90 miles-per-hour in a 65 mile-per-hour zone on Interstate 95. Trooper Lee activated his emergency lights, but Origi did not immediately pull over. He drove beyond the next exit until he came to a stop on the shoulder of the Griffin Road exit ramp.
After the stop, Trooper Lee went to the driver's side window and asked Origi for his license, registration, and insurance card. There was a passenger in the car. Origi appeared "just fine" while he handed over the documents, but the trooper "noticed that he smelled like an alcoholic beverage." Instead of just writing Origi a speeding ticket, Trooper Lee contacted Trooper Richard Nardiello, a member of the DUI taskforce, and asked him to respond as DUI backup. Ten minutes later, Trooper Nardiello arrived.
Trooper Lee advised Nardiello that he had pulled Origi over for speeding, acquired his driving information, and observed "an odor of an alcohol beverage [and] bloodshot and glassy eyes."[1] Trooper Nardiello approached Origi and asked him to step out of the car. After Origi complied, Trooper Nardiello noticed "an odor of an alcohol beverage coming from [Origi's] breath, glassy bloodshot eyes, [and a] flushed face." Origi was "staggering" while he walked and "used the door as a brace to pull himself out" of his car. Once Origi made it to the front of Trooper Nardiello's patrol car, he began to "sway side to side" and his speech was noticeably "slurred."
At this point, Origi refused to cooperate any further with the troopers. He declined to perform sobriety tests and, after being read the implied consent form, refused to submit to a breathalyzer exam. Trooper Nardiello then advised Origi of his Miranda rights. Origi invoked his right to silence. The troopers ceased questioning Origi, arrested him for DUI, placed him in a patrol car, and searched the passenger compartment of Origi's vehicle.
The search produced a lunch cooler full of "copious amounts of drugs" on the passenger's side of the car. Those drugs included: (1) over 55 grams of cannabis; (2) over 26 Xanax pills; (3) approximately 28 grams of cocaine; and (4) over 170 ecstasy pills. A checkbook with Origi's name was in the cooler with the drugs. The troopers also found cash and a list of apparent drug buyers. The passenger gave a brief statement, asserting that the cooler and drugs were not his. No fingerprints were ever taken from the cooler or its contents. The troopers let the passenger go without running a computer check of his driver's license or his criminal record. The troopers then transported Origi to a Breath Alcohol Testing ("BAT") facility for further DUI screening.
Approaching the facility, Trooper Nardiello clutched the cooler of drugs in one hand and Origi's arm in the other. As they entered, Trooper Nardiello said to Origi, "That's a lot of drugs you had." Origi responded, "I have to make money and make a living."
Origi moved to suppress both the statement and the cooler of drugs. The trial court denied both motions.
*71 At Origi's first trial, the jury found him guilty of DUI, but could not reach a verdict on the five drug charges. At the second trial on the drug counts, Troopers Lee and Nardiello described the circumstances surrounding the stop, arrest, and seizure of the cooler. Both troopers testified about the statement Origi made while entering the BAT facility.
Origi testified on his own behalf. He claimed that the night began at a happy hour where he drank alcohol with friends. After a few drinks, Origi went home to nap. Around midnight, one of his friends, Chris, telephoned and invited Origi to the Cheetah strip club. Origi agreed to go and drove to the club.
At the Cheetah, Origi met up with one of Chris's friends, Lee, and resumed drinking. Once Origi began to tire, he decided to leave. Lee also wanted to go. Because Chris wanted to stay, Origi agreed to give Lee a ride home.
Origi testified that he paid his tab and waited for Lee in his car. After a few minutes, Lee came out with a cooler and entered the car. Origi maintained that he did not know what was in the cooler, nor did he ask. On his way to Lee's home, Origi drove on I-95, where the trooper pulled him over for speeding. When asked on cross-examination how his checkbook got into the cooler, Origi responded that "[e]ither Lee or someone put it in there." Lee did not testify at trial.
Origi denied telling Trooper Nardiello that he was a drug dealer and testified that, at some point after his arrest, Trooper Nardiello threatened Origi by telling him to take a plea in this case or "he was going to make sure [he] stayed in jail."
The jury rejected Origi's defense and convicted him of the five drug charges.

The Motion to Suppress the Drugs
Origi argues that the trial court erred in denying his motion to suppress the drugs found in the cooler in his car.[2] Specifically, he challenges the propriety of Trooper Lee's decision to detain him until Trooper Nardiello arrived as DUI backup.
In State v. Taylor, 648 So.2d 701, 703-04 (Fla.1995), the supreme court held that law enforcement may temporarily detain a driver for a DUI investigation based upon a reasonable suspicion. The purpose of such investigation is to determine whether probable cause exists for a DUI arrest. See State, Dep't of Highway Safety & Motor Vehicles v. Haskins, 752 So.2d 625, 627 (Fla. 2d DCA 1999).
A reasonable suspicion "is one which has a factual foundation in the circumstances observed by the officer, when those circumstances are interpreted in the light of the officer's knowledge and experience." See State v. Davis, 849 So.2d 398, 400 (Fla. 4th DCA 2003). In Taylor, for example, when the suspect "exited his car, he staggered and exhibited slurred speech, watery, bloodshot eyes, and a strong odor of alcohol." 648 So.2d at 703. The supreme court recognized that those circumstances, "combined with a high rate of speed on the highway, [were] more than enough to provide [an officer] with reasonable suspicion" to initiate a DUI investigation. See id. (emphasis added).
Based on Taylor, Trooper Lee was justified in detaining Origi for the short period between their contact and Trooper Nardiello's arrival. The state presented evidence that Trooper Lee had observed Origi *72 traveling at a high rate of speed, pulled him over, smelled alcohol, and saw that Origi had bloodshot eyes. These circumstances gave rise to a reasonable suspicion sufficient to justify detaining Origi for a DUI investigation.
Origi quibbles with the trial court's factual findings, arguing that Trooper Lee did not observe anything unusual about his eyes. Trooper Lee testified at the suppression hearing that he could not recall if he took note of Origi's eyes before initiating the DUI investigation; however, Trooper Nardiello vividly recounted that fact. The trial court accepted Trooper Nardiello's recollection of events and we are bound by this finding of fact.

The Motion to Suppress Origi's Statement
Origi next contends that the trial court erred in admitting his statement to Trooper Nardiello as they entered the BAT facility.
In Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of [certain] procedural safeguards. . . ." Among those safeguards is a suspect's right to cut off custodial interrogation by invoking his right to remain silent, a request which law enforcement must scrupulously honor. See Michigan v. Mosley, 423 U.S. 96, 99-100, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). Although the Supreme Court has not precisely defined the phrase "scrupulously honor," the Florida supreme court has recognized law enforcement may not resume interrogation after a suspect invokes his right to silence, unless the circumstances indicate the subsequent exchange was a product of the suspect's free will. See Globe v. State, 877 So.2d 663, 670 (Fla. 2004). At issue in this case is whether Trooper Nardiello's comment to Origi amounted to "interrogation" that would trigger the Miranda protections.
In Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Supreme Court confronted the meaning of "interrogation" under Miranda. After the defendant in Innis invoked his Miranda rights and asked to speak with a lawyer, the police placed him in a police car with wire screen mesh between the front and rear seats. Id. at 294, 100 S.Ct. 1682. On the way to the central police station, two officers spoke to each other about the risk to children that might be posed by a missing shotgun that related to the charge for which the defendant was arrested. Id. at 295, 100 S.Ct. 1682. From the backseat, the defendant overheard the conversation. The defendant interrupted the officers and led the police back to the scene of his arrest, where he took them to the hidden shotgun. Id. The Innis defendant moved to suppress both his statements to the police and the shotgun. Id.
The Court reasoned that "the Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." Id. at 301, 100 S.Ct. 1682. The Court wrote that
the term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the Miranda safeguards were designed to vest a suspect in custody with an added measure *73 of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.
Id. at 298-302, 100 S.Ct. 1682. (emphasis in original) (footnotes omitted).
Despite the breadth of the rule delineated by the Court, the majority held it was not broad enough to encompass the police officers' discussion in that case. Id. at 303, 100 S.Ct. 1682. After holding that the officers' exchange failed to meet the first prong of the interrogation analysis because it included no "express questioning," the court applied the functional equivalent test and found that no interrogation had occurred. Id.
This court has described Innis as providing a "broad and practical definition of `interrogation.'" E.g., Glover v. State, 677 So.2d 374 (Fla. 4th DCA 1996). Applying Innis, we conclude that the trooper's statement to Origi was the "functional equivalent" of interrogation.
First, unlike Innis, this case does not involve the police equivalent of a water cooler conversation, where one officer makes a comment to another in the suspect's presence. Rather, the comment here was directed at the suspect himself (i.e., "That's a lot of drug's you had"). That fact distinguishes this case from those police discussions not directed at the suspect. E.g., Rodriguez v. State, 906 So.2d 1082, 1091 (Fla. 3d DCA 2004) (court concluded that, under Innis, denial of motion to suppress was proper where defendant volunteered statement as the officers were huddled together and pondering out loud whether the appellant's motorcycle was stolen; the court reasoned that "the statements were not the product of the functional equivalent of an interrogation").
Second, the accusatory statement about the drugs was reasonably likely to elicit an incriminating response from Origi. The statement assumed that Origi possessed the drugs, and called for him to comment on the quantity. Confronting Origi about the drugs added an element of compulsion to the case. See Moore v. State, 798 So.2d 50, 53 (Fla. 1st DCA 2001) (holding that an officer engaged in the functional equivalent of interrogation when he asked a suspect to identify clothing found at a crime scene after the suspect was in custody and had invoked his right to silence, regardless of the officer's intentions); State v. Koltay, 659 So.2d 1224, 1226 (Fla. 2d DCA 1995) ("The tactic of `[c]onfronting the accused with incriminating evidence [against him] is a common and traditional method of prompting a recalcitrant suspect to confess.'"); Lornitis v. State, 394 So.2d 455 (Fla. 1st DCA 1981) (holding the same where an officer instructed two suspects to identify their personal belongings in the cargo area of a truck where the officer had also found bails of drugs).
Third, Origi was not merely in custody; the officer grasped Origi in one hand, with a cooler full of drugs in the other. Innis described the Miranda concept of interrogation as reflecting "a measure of compulsion above and beyond that inherent in custody itself." 446 U.S. at 300, 100 S.Ct. 1682. Here, the element of physical coercion enhanced the likelihood of an incriminating response from Origi, thus moving the statement into the pigeonhole of "interrogation."
*74 For these reasons, we hold that the trial court erred in denying the motion to suppress Origi's statement. We do not find the error to be harmless; we cannot say that there "is no reasonable possibility" that the admission of the statement contributed to the convictions on the drug charges. See State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986).
Affirmed in part, reversed in part, and remanded for a new trial.
FARMER and KLEIN, JJ. concur.
NOTES
[1] Trooper Lee's testimony at the suppression hearing was equivocal concerning the appearance of Origi's eyes. However, Trooper Nardiello remembered Trooper Lee telling him that Origi's eyes were "bloodshot and glassy." When ruling on the suppression motion, the trial court accepted Trooper Nardiello's specific recollection of events over the imprecise memory of Trooper Lee. At trial, Trooper Lee testified that Origi had glassy eyes at the time of the stop.
[2] "`The standard of review applicable to a motion to suppress evidence requires that this Court defer to the trial court's factual findings but review legal conclusions de novo.'" Pantin v. State, 872 So.2d 1000, 1002 (Fla. 4th DCA 2004) (quoting Backus v. State, 864 So.2d 1158, 1159 (Fla. 4th DCA 2003)).