WARNER, J.
 

 Jerry Pierre appeals his convictions for first-degree felony murder and robbery and his sentence to life in prison, arguing that the trial court erroneously denied his motion to suppress his statement to police. He claims that he unequivocally invoked his right to stop questioning, which was not honored by the police. Because the totality of circumstances shows that appellant unequivocally invoked his right to remain silent when he told the detective “I’m not saying anymore,” subsequent questioning by the detectives violated appellant’s
 
 Miranda
 
 rights. We reverse.
 

 After receiving his weekly pay, the victim, Juan Paxtore, a Guatemalan, cashed his check and later went out riding his bike with $200 in his pocket. Meanwhile, Kinwend Taylor, Cordealria Collins, Edward Harris, a person known as “Black,” and appellant Pierre, all of whom lived in the same neighborhood and had known each other for a number of years, were hanging out near a store in Fort Pierce, Florida. Collins spotted Paxtore and said, “There go amigo,” meaning that they should rob him. Taylor grabbed Paxtore, and Collins hit him. The others, including Pierre, came from behind a building and also started hitting him, according to the co-defendants. The victim’s pockets were emptied, and the perpetrators left. Witnesses called the police who arrived to find Paxtore dead.
 

 From their investigation, detectives determined that Pierre was a suspect in the robbery-murder. The police picked up Pierre and brought him to the station for questioning. In the interrogation, which was recorded, Pierre first denied any involvement whatsoever in the incident. However, Pierre eventually admitted being with the group and emptying the victim’s pockets of money ($3), but denied hitting the victim.
 

 Pierre and four co-defendants were charged by indictment with first-degree murder and robbery. Pierre’s trial was severed from that of his co-defendants. The principal evidence against Pierre consisted of testimony by co-defendant Kin-wend Taylor, who had not yet been convicted but was not promised anything in exchange for his testimony, and Pierre’s own confession to police, which he unsuccessfully sought to suppress prior to trial.
 
 *762
 
 Pierre was found guilty as charged and sentenced to life in prison. He appeals.
 

 Pierre contends that during his interrogation he twice unequivocally invoked his right to stop questioning, which the detectives ignored. He claims that his subsequent confession should have been suppressed, arguing that it was obtained in violation of his
 
 Miranda
 
 rights. The court’s detailed findings of fact in its order on suppression are based on the court’s viewing of the tape of the interrogation. The court found:
 

 Findings of Fact
 

 Defendant was questioned by Det. Tyrone Campbell and Det. Joseph Coleman in an interview room at the Fort Pierce Police Department. The entire interview was videotaped. Defendant was in custody. He was transported to the department in handcuffs, but the handcuffs were removed before the questioning started.
 

 After obtaining some preliminary information concerning Defendant’s name, height, weight, age and social security number, Det. Campbell read
 
 Miranda
 
 warnings to Defendant. Defendant was given the warnings form to read, which he read to himself in a low voice. As the
 
 Miranda
 
 warnings were being discussed, Defendant gave responses indicating he clearly understood he had a right to have a lawyer present and could stop talking anytime. After he read the
 
 Miranda
 
 and indicated he understood them by moving his head up and down, the following exchange occurred (Transcript, page 5, lines 7-21):2
 

 [Questioning by Det. Campbell]
 

 Q Do you want to talk to us?
 

 A I don’t even know why I’m in this.
 

 Q You don’t know why you’re here?
 

 [by Det. Coleman:]
 

 Q You don’t know why you’re here?
 

 A No.
 

 [by Det. Campbell:]
 

 Q So do you want to sign this
 
 [Miranda
 
 form] and tell us—
 

 A Okay. Let me ask you — ■
 

 [by Det. Coleman:]
 

 Q Basically you’ve been accused of being involved in a robbery. Okay? And we want to talk to you about it.
 

 A What robbery?
 

 Q Robbery of a Mexican man, all happened over on 27th Street. Friday.
 

 The exchange involves the detectives speaking over each other and Defendant.
 

 Defendant testified at the hearing that when he said, “Let me ask you — ,” he was intending to ask for a lawyer to be present. However, upon viewing the exchange on the videotape, observing Defendant’s demeanor on the video, considering all of the statements during the interview, and observing Defendant’s demeanor while testifying at the hearing, the court does not find Defendant’s testimony on this issue to be credible. At no time during the interview did Defendant make any statements indicating he wanted a lawyer. From the context and flow of the conversation leading up to and following the above-quoted exchange, the court finds that the question Defendant wanted to ask is information about what offense he was being questioned about, rather than asking if he could have a lawyer present.
 

 After
 
 Miranda
 
 warnings were given and Det. Coleman explained the subject of the interrogation was robbery of a Mexican man, Det. Campbell asked Defendant, “So do you want to talk to us then?” Defendant responded affirmatively by moving his head up and down.
 
 *763
 
 See, Transcript, page 6, lines 8-9. Viewing the videotape, it is obvious Defendant is responding affirmatively. Immediately thereafter, he cooperates with the interrogation by answering questions. The court finds that Defendant was given proper
 
 Miranda
 
 warnings, he understood the warnings, and he waived his right to remain silent and to have counsel present at that point.
 

 During the hearing, Defendant contends there are two portions of the interview where he attempted to invoke his right to terminate questioning. The first portion of the transcript relied upon by Defendant is page 10, lines 21-25, however, the court determines that the context of the conversation is better understood by considering page 10, line 19, through page 11, line 3, in which the following exchange occurs:
 

 [by Det. Campbell:]
 

 Q What if I tell you that all of you guys going to be seeing each other soon?
 

 A What do you mean, soon?
 

 Q So you walk and say, hey, what’s up, bro.
 

 A I don’t want to see no (inaudible) period. I don’t know what you’re talking about. So I’m just not going to talk anymore. I don’t know what you’re talking about. I was at home Friday night, waiting on my baby mama, me and my cousin, and I see those people.
 

 Q Which Friday night?
 

 A Friday night whenever that Meego night got killed.
 

 Although Defendant makes the statement, “So I’m just not going to talk anymore,” he nonetheless continues speaking. It is obvious from viewing the videotape that Defendant is defensive about knowing the other co-defendants in this case, which is what Det. Campbell is questioning him about. The court finds the statement, “So I’m just not going to talk anymore,” is nothing more than an announcement at that point that Defendant was not going to admit to knowing the co-defendants and being friends with them, rather than an announcement that he wanted to terminate all questioning.
 

 The second instance Defendant claims he wanted to stop all questioning occurs shortly after the first instance, according to the argument made at the hearing. Within a matter of minutes after Defendant first said, “So I’m just not going to talk anymore,” but continues talking, Det. Coleman advised Defendant he wanted to take his picture so that he can show it to witnesses to see if he can be identified by the witnesses. Det. Coleman took the pictures and then stepped out of the interrogation room. While he is out of the room, the following exchange occurs:3
 

 [by Det. Campbell:]
 

 Q Which shoes were you wearing?
 

 A I was wearing some brown Dick-ies with a white shirt and some toast K-Swiss, brown and caramel, it’s dark brown and caramel strips going down. That’s only—
 

 Q So when you were, when you were bragging
 

 A —I wasn’t even — ■
 

 Q the home boys in town did this Mexican—
 

 A Did what? What are you talking about? I didn’t tell you nothing.
 

 Q —did you laugh?
 

 A You tripping, man. I didn’t say nothing. I was nowhere near them guys, I wasn’t with nobody. I was with my cousin, waiting on my baby mama. That’s where I was, 33rd Kentucky. I’m not saying anymore.
 
 *764
 
 [8 second pause before the next question] 4
 

 Q Okay. Are your shoes at your house? Huh? [3 second pause] Are your shoes at your house? Jerry. [20 second pause] Jerry.
 

 A (Det. Coleman returns to the room)
 

 [by Det. Coleman:]
 

 Q Okay. You’re Turtle.
 

 A Turtle?
 

 Q That’s you.
 

 A I’m not Turtle.
 

 The total length of time between when Defendant states, “I’m not saying anymore,” and he says, “I’m not Turtle,” is 50 seconds. During that time, Defendant appears to be somewhat irritated with Det. Campbell for saying he was bragging about “doing the Mexican.” Defendant starts the long pause by leaning over in his chair, presumably doing something with his shoes, then he starts staring up at the ceiling shaking his head from side to side in a somewhat disdainful manner. The State contended at the suppression hearing that immediately after Defendant states, “I’m not saying anymore,” he continues speaking as if muttering to himself. The State argues you can see Defendant’s lips moving as he continues to talk. The court does not perceive Defendant to be muttering to himself after he said he was not going to say anything more.
 

 When Det. Coleman came back into the room claiming Defendant is “Turtle,” Defendant resumes answering questions put to him by Det. Coleman and Det. Campbell.5 The transcript goes on for a total of 59 pages. The entire interrogation lasted approximately one hour and 35 minutes. There are no other words uttered by Defendant which suggest that he wanted to stop the questioning.
 

 During the entire interview, Det. Coleman and Det. Campbell spoke in calm, normal tones. Neither detective raised his voice or acted in an intimidating fashion toward Defendant. Defendant remained calm during the interview, although there were times he seemed a little exasperated by the detectives [sic] attempts to get him to say something incriminating. For most of the interview, Defendant remained steadfast in his denial of being involved in either robbing or killing the victim.
 

 The first time Defendant spoke words to the effect “I am not talking anymore,” he immediately continued talking with no pause. From the flow of the conversation and the context of the words leading up to and after he said, “So I’m just not going to talk anymore,” the court finds that Defendant was merely indicating he wanted to change the subject so as to avoid admitting he knew his co-defendants.
 

 It is true that there is almost a minute pause after the second time Defendant said, “I’m not saying anymore,” before he begins talking again, and it is obvious that Defendant is ignoring anything Det. Campbell is saying to him during that pause. Again, however, from the flow of the conversation and the context of the words leading up to and after the pause when Defendant ignores Det. Campbell’s questions, the court finds Defendant again was trying to change the subject and resist any admission that he was bragging about his involvement in the crime. When Det. Coleman comes back into the room and identifies Defendant to be “Turtle,” Defendant begins talking again, and thereafter makes no expression indicating he wants to stop the questioning. The court does not find that Defendant’s second statement “I’m not talking anymore,” followed by a min
 
 *765
 
 ute of not speaking and ignoring the questions by Det. Campbell during that pause, is an unequivocally [sic] indication he wanted to terminate all questioning. The court finds the statement and the pause to be an attempt to avoid admitting Defendant bragged about his participation in the robbery and murder.
 

 2. The transcript admitted as State’s Exhibit 2 refers to Det. Coleman as "First Interviewer.” In portions of the transcript typed in this order, the court is identifying the speaker as Det. Coleman, rather than "First Interviewer.”
 

 3. The portion of the transcript relied upon by Defendant is page 13, lines 13-15, however, the court determines that the context of the conversation is better understood by considering page 13, lines 4-23.
 

 4. The notation as to the length of the pauses is not in the transcript. The court watched the video and tracked the transcript with a timer to obtain the length of the pauses.
 

 5. There was no argument made or evidence presented to suggest that Det. Coleman came back into the room and accused Defendant of being "Turtle” in an attempt to keep Defendant talking. From the evidence, it appears Det. Coleman was not aware that Defendant had indicated a second time words to the effect "I don’t want to talk.”
 

 Based upon the foregoing facts, the court concluded that Pierre had not unequivocally invoked his right to remain silent, and the detectives’ questions after those statements were not a violation of his rights.
 

 I. Standard of Review
 

 As a general principle, when reviewing a ruling on a motion to suppress, an appellate court presumes the trial court’s findings of fact are correct and reverses only those findings not supported by competent substantial evidence.
 
 Cuervo v. State,
 
 967 So.2d 155, 160 (Fla.2007). Review of the trial court’s application of the law to the facts is de novo.
 
 Id.
 
 As such, appellate courts must independently review mixed questions of law and fact that ultimately determine constitutional issues arising in the context of the Fifth Amendment and article I, section 9 of the Florida Constitution.
 
 Id.
 

 The supreme court recognizes an exception to that standard where the trial court relies on evidence other than live witnesses. In
 
 Parker v. State,
 
 873 So.2d 270, 279 (Fla.2004), the court stated:
 

 Generally, in reviewing a trial court’s ruling on a motion to suppress, this Court accords a presumption of correctness to the trial court’s findings of historical fact, reversing only if the findings are not supported by competent, substantial evidence, but reviews de novo “whether the application of the law to the historical facts establishes an adequate basis for the trial court’s ruling.”
 
 Connor v. State,
 
 803 So.2d 598, 608 (Fla.2001), ce
 
 rt. denied,
 
 535 U.S. 1103, 122 S.Ct. 2308, 152 L.Ed.2d 1063 (2002). However, this deference to the trial court’s findings of fact does not fully apply when the findings are based on evidence other than live testimony.
 
 Cf. Thompson v. State,
 
 548 So.2d 198, 204 n. 5 (Fla.1989) (“[T]he clearly erroneous standard does not apply with full force in those instances in which the determination turns in whole or in part, not upon live testimony, but on the meaning of transcripts, depositions or other documents reviewed by the trial court, which are presented in essentially the same form to the appellate court.”).
 

 In
 
 Cuervo,
 
 the supreme court reviewed the taped confession viewed by both the trial court and the Fifth District and, based upon its review, held that competent substantial evidence did not support the trial court’s findings that Cuervo did not invoke his right of silence. In this case, the trial judge’s findings of fact exclusively relied on the judge’s viewing of the tape of
 
 *766
 
 the interrogation. Because the tape is available to this court, and we have viewed it,
 
 [1]
 
 we do not agree with the trial judge’s conclusions based upon his observations, and thus we do not accord those findings deference. There are also other facts which bear upon the issue.
 

 II. Factual Analysis Shows Invocation of Right to Remain Silent was Unequivocal
 

 Having been brought to the police station in handcuffs and leg irons, the officers first removed the handcuffs on Pierre but did not remove the leg irons. At the very beginning of the interrogation, Detective Coleman asked Pierre his name. Then he asked, “Are you the guy they call Turtle?”
 

 Pierre denied that was his nickname. Coleman asked if Pierre knew who Turtle was, and Pierre said he did not. Then the detectives discussed Pierre’s
 
 Miranda
 
 rights with him. He specifically asked about and understood that he could stop the questioning whenever he wanted. After they discussed those rights, the detectives asked if Pierre wanted to talk, and Pierre responded, “I don’t really know why I’m in here.” Coleman then told him he was accused of being involved in the robbery of a Mexican man on the previous Friday. Pierre said that he was not there, claiming he was at home at the time. Pierre then signed the waiver of rights form and the detectives began their questioning.
 

 Coleman asked Pierre if he knew Corey and Kinwend. Pierre said that he had heard of them but did not “mess” with them. Coleman left the room. After several more questions from Campbell about whether Pierre could identify the two boys, Pierre- then told Campbell he was not going to talk about it, but then proceeded to say that he was home. After that statement, Coleman re-entered the room with a camera. He told Pierre he was taking a picture of him. Coleman then told Pierre that the reason he was taking his picture was to show it to “to somebody, somebody who has made the accusations to make sure you’re that guy.... He says no, it ain’t you, you’re going home.” Detective Campbell added, “Yeah, but he just said to me a while that um, he met these guys and (INDISCERNIBLE) by their face, see them, how the clothes their [sic] wearing.” Detective Coleman took the picture and left the room.
 

 After Detective Coleman left the room, Detective Campbell asked Pierre whether the clothes he was wearing were the clothes he wore on Friday night. Pierre described the clothes he was wearing on Friday. Campbell asked something indiscernible but ending with “did this Mexican,” to which Pierre responded, “Did what, what are you talking, I didn’t take nothing. You tripping, man, I didn’t say nothing. I was nowhere near them guys. I wasn’t with nobody, I was with my cousin waiting on my baby momma, that’s where I was, 33rd and Kentucky.
 
 I’m not saying anymore.”
 
 (Emphasis supplied). At that point, as the trial court notes in the findings of fact, Pierre says nothing further, even though Detective Campbell tries to ask another question.
 
 After that question, Detective Campbell sits silent as well.
 
 Pierre looks down, and then looks up at the ceiling. He appears to be muttering to himself. No sound is coming out. Pierre does do something with his feet, as the trial court noted, but it appears that he is adjusting the leg irons.
 

 The silence lasts nearly a minute until Detective Coleman comes in and says in a
 
 *767
 
 firm, accusatory tone, “You’re Turtle.” His tone conveys that this is a statement of fact, as though whoever looked at the photo confirmed that nickname. Pierre then responds defensively.
 

 MR. PIERRE: Turtle?
 

 DETECTIVE COLEMAN: That’s you.
 

 MR. PIERRE: I’m not Turtle.
 

 DETECTIVE COLEMAN: That’s you. So are you gonna, are you gonna tell us what happened that night, (INDISCERNIBLE)?
 

 MR. PIERRE: (INDISCERNIBLE). Tell you about what, I ain’t telling you, I didn’t do nothing, I was at my house.
 

 DETECTIVE COLEMAN: Well, right now I got ...
 

 MR. PIERRE: With my cousin.
 

 DETECTIVE COLEMAN: I got 2 guys saying you were involved.
 

 Pierre then responds to their questions for about forty-five minutes by continuing to deny involvement, sometimes sitting silent as the officers continued to try to get him to make a statement. Even when the officers told him there was video evidence from a store camera close to the location of the crimes which would show who was there, he maintained he was not there. The officers detailed what the other defendants had told them about Pierre’s involvement. They told Pierre he faced life in prison, yet he continued to maintain that he was not there. Only when Detective Campbell told Pierre that he would not see his child again for a while because he was going to jail for robbery and murder did Pierre then state that he did not stomp the victim. After several more questions, Pierre told them that the robbery was Edward’s idea and that Edward was the only one stomping the victim. Pierre took the money from the victim’s pockets. The interrogation continued for another twenty or thirty minutes, and Pierre made more incriminating statements until he finally said again, “I’m not talking anymore.” When Detective Coleman asked another question, Detective Campbell stopped him, telling Coleman, “He said he didn’t want to talk anymore, man.” The interrogation ended.
 

 Generally, “if the suspect indicates in any manner that he or she does not want to be interrogated, interrogation must not begin or, if it has already begun, must immediately stop.”
 
 Cuervo,
 
 967 So.2d at 161 (quoting
 
 Traylor v. State,
 
 596 So.2d 957, 966 (Fla.1992)). The phrase “in any manner” simply means that there are no magic words that a suspect must use to invoke his rights.
 
 State v. Owen,
 
 696 So.2d 715, 719 (Fla.1997). “[O]nce a defendant waives his or her right to remain silent, subsequent equivocal requests to terminate an interrogation do not automatically require police to cut off all questioning.”
 
 Cuervo,
 
 967 So.2d at 161. “A suspect must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent.”
 
 Owen,
 
 696 So.2d at 718. “[A] determination of the issues of both the voluntariness of a confession and a knowing and intelligent waiver of
 
 Miranda
 
 rights requires an examination of the totality of the circumstances.”
 
 Lukehart v. State,
 
 776 So.2d 906, 917 (Fla.2000).
 

 From a review of the taped interrogation, there is no competent substantial evidence to support the trial court’s finding that Pierre’s near minute of silence, after telling the detective he was not going to say anything, was an effort by Pierre to change the subject of the questioning. In fact, Detective Campbell did change the subject, because he asked where Pierre’s shoes were located, and Pierre refused to answer. Then Detective Campbell himself
 
 *768
 
 fell silent and discontinued questioning. The only interpretation that can be made from the tape is that, as a reasonable police officer, Detective Campbell understood Pierre’s statement to be a demand that questioning cease.
 

 III.
 
 State v. Owen
 
 is Distinguishable
 

 The state relies on
 
 State v. Owen,
 
 696 So.2d 715 (Fla.1997),
 
 reaffirmed in Owen v. State,
 
 862 So.2d 687, 696-98 (Fla.2003), involving a March 24, 1984, burglary, sexual battery, and murder in Delray Beach. The supreme court found competent substantial evidence supporting the trial court’s determination that the defendant’s statements “I don’t want to talk about it” and “I’d rather not talk about it” were equivocal and did not require suppression of his confession. The state claims that Pierre’s statement “I’m not saying anymore” is virtually indistinguishable from those in
 
 Owen.
 
 However, the totality of the circumstances of that confession are far different than the present circumstances, and we find
 
 Owen
 
 distinguishable.
 

 The detailed facts involved in
 
 Owen
 
 are found in
 
 Owen v. State,
 
 560 So.2d 207 (Fla.1990). Owen had been picked up as a burglary suspect. While in custody, he initiated contact with the police to discuss various crimes, as well as a murder in Boca Raton. He wanted to clear up his involvement in several of these crimes. After confessing to numerous crimes, he invoked his right to silence with respect to the Boca murder, and the officers ceased questioning.
 

 Several days later Owen reinitiated contact with the police and confessed to more crimes. Based upon his confessions, police were able to expand their investigation. Meanwhile, Delray Beach police obtained footprint evidence from the Delray murder scene linking Owen to that crime. Armed with physical evidence in the Boca murder, police informed Owen several days later that they were charging him with the murder. He confessed to the Boca murder.
 

 Immediately thereafter, Delray police interrogated Owen with respect to the Del-ray murder. At first he denied involvement but then confessed to this murder as well. As the supreme court noted, a decided pattern developed in the multiple interrogation sessions with Owen. Owen would confess to crimes where he thought that the officers had sufficient proof to convict. Thus, the officers would present their proof to Owen in an attempt to convince him to confess to the crimes.
 

 During the interrogation regarding the Delray murder, the police presented Owen with the footprint evidence as well as the close similarities between the Boca murder, to which Owen had confessed, and the Delray murder. Owen studied the footprint carefully and appeared to acknowledge its conclusiveness. When the officers questioned him on what the supreme court stated was an “insignificant detail,” Owen said, “I’d rather not talk about it.”
 
 Id.
 
 at 211. Police did not stop questioning, but implored him to clear matters up about this murder too. After several more questions, and again after a question on an insignificant detail, Owen again said, “I don’t want to talk about it.”
 
 Id.
 
 He then confessed to the Delray murder.
 

 The court in
 
 Owen
 
 concluded that Owen’s statements were “at the least, an equivocal invocation of the
 
 Miranda
 
 right to terminate questioning.”
 
 Id.
 
 at 211. The court held that, based upon its understanding of federal precedent, even the equivocal invocation of rights by Owen required that the police clarify whether the suspect had indeed intended to invoke his right before additional questioning. The court thus reversed Owen’s conviction and death sentence and remanded for a new trial.
 

 
 *769
 
 Prior to Owen’s retrial, the United States Supreme Court decided
 
 Davis v. United States,
 
 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), in which the Court held that police did not have to stop questioning upon ambiguous or equivocal requests for counsel. The state sought to admit Owen’s confession in the second trial on the basis that Owen’s statement, indicating that he did not want to talk, was ambiguous. In
 
 State v. Owen,
 
 696 So.2d at 719-20, our supreme court applied
 
 Davis
 
 and held that police did not have to ask clarifying questions when an invocation of a suspect’s right to terminate questioning was equivocal. Because the court found that Owen’s statement regarding the right to remain silent was equivocal, the court permitted the use of Owen’s confession.
 

 Owen’s statement, “I don’t want to talk about it,” was equivocal or ambiguous under the circumstances. First, Owen had initiated several interrogation sessions with the police himself. Second, he had developed a pattern of confessing to crimes when the police produced enough evidence to convince him that they could prove his guilt, and he would continue the interrogation as the police produced evidence. Third, his refusal to talk about “it” followed a question about an insignificant detail of the crime. The “it” could have been the insignificant detail and not the crime itself. Given the fact that Owen had engaged in multiple interrogation sessions, seeking to answer the police questions, a reasonable police officer could have thought that Owen was not intending to cut off all questioning.
 

 The facts of
 
 Owen
 
 are entirely different than the facts involved in Pierre’s demand to terminate questioning in this case. Here, unlike in
 
 Owen,
 
 Pierre’s statement that he was “not saying anymore,” followed by his actual silence for a period of nearly a minute, could not reasonably be interpreted as a desire to remain only “selectively silent” as to a particular line of questioning. Instead, Pierre’s conduct reflected an unequivocal invocation of Pierre’s right to remain silent.
 
 See, e.g., State v. Murphy,
 
 342 N.C. 813, 467 S.E.2d 428, 433-34 (1996) (suspect’s statement “I got nothing to say” was a clear indication that he wished to terminate the interrogation and invoke his right to remain silent, which was not scrupulously honored);
 
 People v. R.C.,
 
 108 Ill.2d 349, 91 Ill.Dec. 606, 483 N.E.2d 1241, 1243-44 (1985) (minor suspect’s statement that he “did not wish to talk to” the investigating officer constituted an invocation of the right to remain silent).
 

 IV. Police did not Scrupulously Honor Pierre’s Right to Terminate Questioning
 

 Once Pierre invoked his right to silence,
 
 Miranda
 
 required that all questioning cease and that his right to cut off questioning be “scrupulously honored.”
 
 See Michigan v. Mosley,
 
 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). In
 
 Mosley,
 
 the Court found that the police honored the right by ceasing questioning once the suspect invoked his right.
 

 When Mosley stated that he did not want to discuss the robberies, Detective Cowie immediately ceased the interrogation and did not try either to resume the questioning or in any way to persuade Mosley to reconsider his position. After an interval of more than two hours, Mosley was questioned by another police officer at another location about an unrelated holdup murder. He was given full and complete Miranda warnings at the outset of the second interrogation. ...
 

 This is not a case, therefore, where the police failed to honor a decision of a person in custody to cut off questioning,
 
 *770
 
 either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind.
 

 Id.
 
 at 104-06, 96 S.Ct. 321. The Florida Supreme Court distilled five relevant factors from
 
 Mosley
 
 to determine whether the authorities scrupulously honored a defendant’s invocation of his right to silence:
 

 First, Mosley was
 
 informed of his fights both times
 
 before questioning began. Second, the officer
 
 immediately ceased questioning
 
 when Mosley unequivocally said he did not want to talk about the burglaries. Third, there was a
 
 significant lapse of time
 
 between the questioning on the burglary and the questioning on the homicide. Fourth, the second episode of
 
 questioning took place in a different location.
 
 Fifth, the second episode
 
 involved a different crime.
 

 Globe v. State,
 
 877 So.2d 663, 670 (Fla.2004) (quoting
 
 Henry v. State,
 
 574 So.2d 66, 69 (Fla.1991)). A variance of one or more factors is not dispositive, and each case requires a totality of the circumstances approach.
 

 While Pierre received his complete
 
 Miranda
 
 warnings — satisfying the first
 
 Mosley
 
 factor — and Detective Campbell immediately ceased questioning Pierre, Detective Coleman’s assertion, upon reentering the room, that Pierre was Turtle amounted to interrogation under the analysis of
 
 Origi v. State,
 
 912 So.2d 69 (Fla. 4th DCA 2005). Thus, the officers did not cease questioning after Pierre’s unequivocal invocation of his right to silence.
 

 In
 
 Origi,
 
 a suspect invoked his right to remain silent after he was arrested in a traffic stop and read his
 
 Miranda
 
 rights. The officers searched the vehicle and discovered a large amount of illegal drugs. On the way to the jail, an officer said to Origi, “That’s a lot of drugs you had.”
 
 Id.
 
 at 70. Origi responded, “I have to make money and make a living.”
 
 Id.
 
 Origi moved to suppress his response on the ground that it was a violation of
 
 Miranda.
 
 This court relied on
 
 Rhode Island v. Innis,
 
 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), to determine what constituted interrogation.
 
 Innis
 
 explained:
 

 [T]he
 
 Miranda
 
 safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent....
 

 [T]he term “interrogation” under
 
 Miranda
 
 refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the
 
 Miranda
 
 safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they
 
 should have knoum
 
 were reasonably likely to elicit an incriminating response.
 

 Innis,
 
 446 U.S. at 300-02, 100 S.Ct. 1682 (footnotes omitted) (emphasis in original).
 

 Applying
 
 Innis,
 
 we held that the officer’s statement was the functional equiva
 
 *771
 
 lent to interrogation because: (1) the officer directed the statement to Origi, not some other person; (2) the comment was accusatory and was intended to elicit a response from Origi (“The statement assumed that Origi possessed the drugs, and called for him to comment on the quantity. Confronting Origi about the drugs added an element of compulsion to the case.”); and (3) there was an element of physical coercion attendant to the statement in that the officer had Origi in his grasp.
 
 Origi,
 
 912 So.2d at 73.
 

 Similarly, Detective Coleman’s statement to Pierre that “[y]ou’re Turtle” was directed at Pierre, not to another person. The statement was accusatory, because Coleman had already told Pierre that he was taking his picture to show to witnesses who could identify the participants in the robbery-murder, and at the beginning of the interrogation Coleman had already asked if Pierre was Turtle. It seems clear that witnesses had pointed out Turtle as a participant in the crime. Listening to the tape and the tone of the voice, Coleman’s assertion that Pierre was Turtle, immediately after he re-entered the room after the photo identification session with witnesses, was intended to evoke a response. Therefore, in line with
 
 Origi,
 
 Detective Coleman’s assertion constituted questioning in violation of
 
 Miranda.
 

 That Detective Coleman may not have known that Pierre had invoked his right of silence does not avoid
 
 Miranda.
 
 Detective Campbell heard Pierre invoke his right and stopped questioning. Either Detective Coleman should have inquired as to whether Pierre was still answering questions before continuing the questioning, or Detective Campbell should have alerted Detective Coleman to Pierre’s invocation. In fact, when Pierre again invoked his right to terminate questioning later in the interview, by using the identical language to his prior invocation — “I’m not talking anymore,” — Campbell
 
 did
 
 stop Coleman from continuing questioning. Campbell should have stopped Coleman earlier when Coleman re-entered the room. As the Supreme Court said with respect to observance of the invocation of a right to an attorney, “custodial interrogation must be conducted pursuant to established procedures, and those procedures in turn must enable an officer who proposes to initiate an interrogation to determine whether the suspect has previously requested counsel.”
 
 Arizona v. Roberson,
 
 486 U.S. 675, 687, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988). This same admonition should apply to an invocation of the right to remain silent. If that is not the rule, then a suspect’s
 
 Miranda
 
 rights could very easily be thwarted.
 

 Returning to the
 
 Mosley
 
 factors, we conclude that Pierre’s invocation of the right to remain silent was not scrupulously honored. While Detective Campbell ceased questioning, Detective Coleman did not. Only about a minute passed between Pierre’s termination of questioning and Detective Coleman’s continuation of the interrogation, hardly a significant lapse of time. Pierre was never reread his
 
 Miranda
 
 rights, and the questioning continued in the same location before the same detectives. Moreover, even after Pierre responded to Detective Coleman that he was not Turtle, Pierre continued to deny involvement in the activity and tried to avoid the questions. Unlike
 
 Mosley,
 
 this
 
 was
 
 a case “where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind.”
 
 Mosley,
 
 423 U.S. at 105-06, 96 S.Ct. 321. That is exactly what occurred in the interrogation of Pierre.
 

 
 *772
 
 Because Pierre unequivocally invoked his right to terminate questioning, which right was not scrupulously honored, the trial court erred in denying the motion to suppress Pierre’s statement to police. We reverse and remand for a new trial during which the confession is excluded.
 

 GROSS, C.J., and CIKLIN, J., concur.
 

 [1]
 

 . The tape viewed was a VHS tape admitted at the hearing on the motion to suppress.