TAYLOR, J.
In this prosecution against multiple defendants for conspiracy to traffic in oxyco-done and trafficking in oxycodone, the state appeals from the trial court’s order granting the defendants’ joint motion to suppress evidence obtained after a traffic stop for littering. We reverse.
Deputy Frank Castor of the Broward Sheriffs Office testified at the hearing on the motion to suppress. He said that while patrolling southbound near the Commercial Boulevard and Northwest 31st Avenue intersection in Tamarac he observed an object being tossed out of the window of a minivan. When the minivan pulled into the back of a shopping center, Castor followed it and activated his emergency lights. He initiated a traffic stop for a violation of Florida’s litter law. Deputy Castor approached the car and asked the driver for identification. The driver, Felicia Maynard, did not have her license in her possession but told the deputy she had a valid Kentucky license. Deputy Castor wrote down her name and date of birth. Through the teletype channel, he confirmed that Maynard had a valid Kentucky license.
Deputy Castor turned off his emergency lights, approached the car again, and warned the occupants to keep their garbage in the car. At that point, according to Deputy Castor, the traffic stop was over and the occupants were free to go. However, he asked them if they were willing to talk to him. The deputy was in uniform, but he did not draw his weapon, make any threats, or promise them anything to speak with him. All six occupants agreed and handed over their identification — Kentucky licenses or ID cards — to the deputy.
Deputy Castor asked if there were any narcotics or weapons in the car. The occupants all responded that they had prescriptions located in a lock box. The deputy did not see a lock box, so he asked for clarification. The front passenger, Angie Evans, said she had the lock box in her backpack. Deputy Castor asked for consent to search the lock box. Evans responded, “no problem ... I have the key for it.” Evans then got out of the passenger side and took the lockbox to the trunk of the deputy’s patrol car and opened it. None of the occupants protested or objected to the deputy’s looking inside the box.
When Evans opened the lock box, the deputy saw numerous bottles of Oxyco-done, in both 30 mg and 15 mg doses, with label prescriptions in everyone’s name except for the driver and Evans. The quantities of pills in these bottles, however, appeared to be inconsistent with personal use.[1] No one other than Evans appeared *862 to be in possession of the lock box, and she had a key to the lockbox. Evans was also in possession of $1500 in cash. The prescriptions were filled at a local pharmacy, which was a known source for persons coming from out of state to obtain such drugs and transport them back home for illegal sale.
Deputy Castor testified that in his training and experience, he has encountered a large number of people from Midwestern states — particularly Kentucky, Ohio, and West Virginia — who have come to Florida for the specific purpose of obtaining large amounts of Oxycodone from the same pharmacy named on the bottles in the lock box. Usually, there is a sponsor who pays for the runners’ entire trip. Based on his observations, he believed that the defendants were in Florida for the same purpose. At this point, Deputy Castor contacted Detective William Schwartz from the BSO Drug Diversion Unit and told him what had happened. Schwartz instructed Castor to detain them until he could arrive in a few minutes. Deputy Castor removed all the occupants from the minivan and separated them. Detective Schwartz and his partner arrived in about ten minutes and took over the investigation. After the defendants were given Miranda warnings, they provided statements admitting their involvement in an Oxycodone trafficking ring.
Detective Schwartz also testified at the suppression hearing. He explained that in October 2008 he worked for the Strategic Investigations Division and Drug Diversion Unit. As a member of the Unit, his job was to advise officers on interstate trafficking of prescription drugs, especially by runners from Kentucky and Ohio. He explained how these interstate drug deals generally work. Detective Schwartz said that Evans was most likely the sponsor, and Maynard the driver. He then explained the significance of the bottles and quantities of pills recovered from the lock box.
The trial court found that the initial traffic stop for littering was valid, and that the traffic stop was followed by a consensual citizen’s encounter. The court went on to find, however, that when the deputy detained the defendants for further investigation by Detective Schwartz, the defendants were not free to leave and the encounter evolved into a stop and detention. The court concluded that the deputy lacked a reasonable or articulable suspicion for the detention, because all he had was a large quantity of prescription medications with what appeared to be valid prescription labels. The court further not *863 ed that the deputy never verified whether the prescriptions were, in fact, issued by the doctor. In its order granting the joint motion to suppress, the court stated that “[t]he officer did not have probable cause to detain the Defendants past the initial stop for littering or seize the prescription medicine.” The state appealed the order of suppression.
“We review orders on motions to suppress to determine whether the trial court’s factual findings are supported by competent substantial evidence and review legal issues de novo.” State v. Young, 971 So.2d 968, 971 (Fla. 4th DCA 2008) (citing Thomas v. State, 894 So.2d 126, 136 (Fla. 2004)). “A trial court’s ruling on a motion to suppress is clothed with a presumption of correctness on appeal, and the reviewing court must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court’s ruling.” State v. Hebert, 8 So.3d 393, 395 (Fla. 4th DCA 2009) (citing State v. Manuel, 796 So.2d 602, 604 (Fla. 4th DCA 2001)). “When considering a motion to suppress, a court is required to consider the ‘totality of [the] circumstances’ that led to the discovery of evidence.” State v. Hendrex, 865 So.2d 531, 533 (Fla. 2d DCA 2003) (citing State v. Butler, 655 So.2d 1123, 1128 (Fla.1995)). Further, the appellate court “review[s] de novo whether the application of the law to the historical facts establishes an adequate basis for the trial court’s finding of reasonable suspicion.” Hollingsworth v. State, 991 So.2d 990, 992 (Fla. 4th DCA 2008) (citing Lee v. State, 868 So.2d 577, 579 (Fla. 4th DCA 2004)).
Here, the trial court’s factual findings are not disputed. The state contends that the trial court’s legal conclusions were incorrect because the deputy, based on his training, experience, and observations, had sufficient reasonable suspicion to conduct an investigatory stop of the defendants. We agree. During the deputy’s discussion with the defendants after the traffic stop, he learned that all the van’s occupants were from Kentucky, a Midwestern state previously identified by law enforcement as the origin of substantial drug runner activity in Florida; that the Oxycodone prescriptions were filled by a local pharmacy commonly used by drug runners; that a passenger was in sole possession of a lockbox that contained several bottles of large quantities of Oxycodone prescribed for everyone except herself and the driver, and that she also had in possession a substantial amount of cash, which could have been used to finance the operation.
In Popple v. State, 626 So.2d 185, 186 (Fla.1993), the Florida Supreme Court stated that in an investigatory stop, as described in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), “a police officer may reasonably detain a citizen temporarily if the officer has a reasonable suspicion that a person has committed, is committing, or is about to commit a crime.”[2] A reasonable suspicion “has a factual foundation in the circumstances observed by the officer, when those circumstances are interpreted in the light of the officer’s knowledge and experience.” Origi v. State, 912 So.2d 69, 71 (Fla. 4th DCA 2005).
Section 893.135(l)(c)l., Florida Statutes (2008), provides, in pertinent part, that any person who “knowingly sells, purchases, manufactures, delivers, or ... who is *864 knowingly in actual or constructive possession of, 4 grams or more of ... oxycodone” commits a felony of the first degree, which felony shall be known as “trafficking in illegal drugs.” It seems that the trial court, in finding that the officer lacked grounds for detaining the defendants, focused on the fact that the prescription bottles in Evans’s possession appeared to have valid prescription labels. However, as the state points out, the crime of trafficking can be committed in ways other than by unlawfully possessing the Oxycodone. Section 893.135(l)(c)l. also prohibits the act of unlawfully delivering oxycodone.
We conclude that the totality of circumstances, viewed through the lens of the deputy’s training and experience, gave the deputy reasonable suspicion to believe that the defendants were engaged in trafficking in Oxycodone. His temporary detention of the defendants was therefore justified. Accordingly, we reverse the order granting the defendants’ motion to suppress and remand for further proceedings.

Reversed and Remanded.

WARNER and CONNER, JJ., concur.

. Detective William Schwartz testified to the quantities as follows:
[Item] 1.1 was a prescription bottle, RX 41325, labeled to the name of Leslie Triplett, for Oxycodone, 30 milligrams, quanti *862 ty of one hundred, allegedly authorized by (doctor) on 10/31 '08, filled in [pharmacy], containing at the time of receipt in one hundred Oxycodone thirty milligram tablets, approximate weight of 12.4 grams.
[[Image here]]
... Another prescription was found for Leslie Triplett for Oxycodone thirty, quality [sic] of one hundred, containing one hundred pills, same doctor. Another prescription for Leslie Triplett for Oxycodone, thirty milligrams, quantity of one hundred, filled by that doctor containing only ten. Prescription for Michael Maynard, Oxyco-done, thirty milligrams, labeled as quantity of 240, containing one hundred and 40 Oxy-codone thirty milligram tablets.
A second one for Michael Maynard, same prescriptions. This bottle containing one hundred Oxycodone thirty milligram tablets. And traveled down to item number 3.1 a prescription for Wesley [sic] Triplett for Oxycodone, thirty milligrams, quantity of 210.
This one authorized by [doctor]. This bottle contains one hundred Oxycodone 30 milligram tablets, 3.2. Again, for Welsey [sic] Triplett, Oxycodone, thirty milligrams, same label," same bottle, containing one hundred Oxycodone 30 milligram tablets. And finally, the last bottle labeled to Weslie Triplett, for Oxycodone, 15 milligrams, quantity of 90, and this one contained 80 Oxycodone, 15 milligrams.

. Florida’s “Stop and Frisk Law,” codified in Section 901.151, Florida Statutes (2008), permits "a law enforcement officer who encounters any person under circumstances which reasonably indicate that such person has committed a crime to temporarily detain the suspect and ascertain identity and the circumstances that led the officer to believe that a crime had been committed.”